SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------
EDWARD COYNE,

Petitioner,

                                    **VERIFIED PETITION**

        -against-

                                      Index No.

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF EDUCATION; CARMEN FARINA,
CHANCELLOR of NEW YORK CITY DEPARTMENT
OF EDUCATION;

Respondents,

For an Order and Judgment Pursuant to Article 78 of the
Civil Practice Law and Rules.
--------------------------------------------------------------------

Petitioner EDWARD COYNE, by his attorneys GLASS KRAKOWER LLP, as and for

her Verified Petition, respectfully alleges as follows:

1.      This is a special proceeding commenced to challenge, reverse, and annul the

November 21, 2016, determination of Respondent New York City Department of Education

("NYCDOE") to sustain Petitioner Edward Coyne's "Unsatisfactory" Pedagogical Supervisory

Personnel Report ("PSPR") for the 2015-16 school year as a licensed Assistant Principal at

Flushing High School in Queens, New York.

2.      Petitioner seeks a reversal and/or annulment of his 2015-16 "Unsatisfactory"

PSPR due to false allegations against Petitioner by Petitioner's Principal being subterfuge to

push Petitioner out of the school and force him to retire.

3.      Petitioner requests a trial of any triable issues of fact pursuant to CPLR Section

7804(h), as well as oral argument on this petition.

1

Case 1:17-cv-08607-DLC  Document 11-1  Filed 12/19/17  Page 2 of 79

## The Parties

4.     Petitioner EDWARD COYNE is a resident of the State of New York, and a former Assistant Principal employed by Respondent New York City Department of Education ("NYCDOE"), within the school system operated by said Respondents.  At all times relevant to this Verified Petition, Petitioner was employed at Flushing High School.

5.     Respondent CITY OF NEW YORK is a municipality of the State of New York, charged with educating the children of the citizens of New York City.

6.     Respondent NEW YORK CITY DEPARTMENT OF EDUCATION (formerly known as the NEW YORK CITY BOARD OF EDUCATION) is a duly authorized and existing agency or corporation of the municipality of the City of New York, charged with educating the children of the citizens of New York City.

7.     Respondent CARMEN FARINA was the Chancellor of Respondent NYCDOE, and, as such, was said Respondent's chief executive officer at the time of the November 21, 2016 decision on Petitioner's "Unsatisfactory" rating appeal.

## Venue

8.     Venue is placed in New York County, New York pursuant to CPLR Section 506(b) because it is where the headquarters of the NYCDOE is located.

## Statement of Facts

9.     Since September 1991, Petitioner had been a consistently rated Satisfactory pedagogue with the NYCDOE until the 2015-16 school year.

10.     Petitioner began his career in September 1991 as a junior high school social studies teacher at I.S. 77 in Ridgewood, Queens.

2

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 3 of 79

11.   Petitioner next worked as a high school social studies teacher at William Cullen Bryant High School from 1992 to 1999.

12.   He then became an Assistant Principal at Grover Cleveland High School from March 2000 to June 2000.

13.   Petitioner thereafter was placed in Long Island City High School from September 2000 to April 2001.

14.   In April 2001, Petitioner was appointed as the Assistant Principal ("AP") of Administration/Security at Flushing High School, and became tenured as an Assistant Principal in 2006.

15.   In the 2013-14 school year, Petitioner was asked to be the Assistant Principal of Physical Education and Health at Flushing High School, as well as continue as the AP of Administration/Security.

16.   Petitioner received all "Satisfactory" annual evaluations both as a teacher and then as an Assistant Principal until the 2015-16 school year.

17.   Principal Tyee Chin was appointed to be principal at the Flushing High School in or about June 2015, and immediately began treating Petitioner unfairly, creating a hostile work environment, harassing Petitioner, and targeting Petitioner on the basis of age.

18.   In June 2015, upon learning of Principal Chin's appointment as Principal, Petitioner sent Principal Chin numerous emails requesting Principal Chin's assistance and asking for Principal Chin to meet with Petitioner. Principal Chin refused to meet with Petitioner and failed to address the issues raised in Petitioner's numerous emails. Copies of these emails are annexed hereto as Exhibit A.

3

19.     Principal Chin finally met with Petitioner in September 2015. Principal Chin told Petitioner upon meeting him, "I was told not to trust you," that someone in the Superintendent's office had warned Principal Chin about Petitioner, and "If I had to make a decision now, you would not have a job next September."

20.     In October 2015, Principal Chin began a campaign of harassment against Petitioner.

21.     Principal Chin, for example, called in Petitioner's former secretary on or about October 15, 2016 and asked her, if Petitioner had ever been inappropriate towards her. Notably, Principal Chin was not performing his duties as an investigator investigating an allegation of misconduct; he was simply attempting to find something on which he could write up Petitioner.

22.     For example, on October 19, 2015, Principal Chin sent an email falsely accusing Petitioner of not allowing students entry into the building. A copy of this email, as well as Petitioner's email to his union delegate documenting this harassment and Petitioner's rebuttal to this accusation, is annexed hereto, collectively, as Exhibit B.

23.     Principal Chin also wrote a letter to file on or about January 4, 2016 falsely accusing Petitioner of failing to attend Parent-Teacher Night, as required. In fact, there was no such requirement; pursuant to Council of School Administrators ("CSA") contract, Principal Chin was not allowed to require Petitioner to attend Parent-Teacher Night. A copy of this letter is annexed hereto as Exhibit C.

24.     Principal Chin wrote a second letter to file about Petitioner on or about January 4, 2016, this time falsely noting that Petitioner failed to file an Online Occurrence Reporting System ("OORS") report after a fight on November 30, 2015 and falsely accusing the Dean's Office of not knowing how to file an OORS report. In actual fact, Petitioner was out of the office

4

Case 1:17-cv-08607-DLC Document 11-1 Filed 12/19/17 Page 5 of 79

with a broken elbow sustained from breaking up the fight referenced in the letter. The OORS report was not required to be submitted until several days later, which Petitioner intended to do upon returning to the school. Furthermore, the investigation had not been completed, and it would have been improper to file the OORS report before the investigation had been completed. As such, the allegations contained in the letter are inaccurate and improper. A copy of this letter is annexed hereto as Exhibit D.

25.     Further, Principal Chin wrote a third letter to file about Petitioner on or about January 4, 2016, this time frivolously and falsely accusing Petitioner of giving two deans one hour of per session compensation for attending a Parent-Teacher pre-conference meeting in the auditorium. A copy of this letter is annexed hereto as Exhibit E.

26.     Each one of these aforementioned allegations was wholly false and had no basis in fact.

27.     Respondents also participated in discriminatory exclusionary behavior against Petitioner. For example, beginning in November 2015, Principal Chin unfairly denied Petitioner the opportunity to attend the monthly "Building Safety Meeting" for the remainder of the school year. This was a monthly meeting that Petitioner had always attended in the past, and one that was attended by all other co-located school Principals and Assistant Principals during the 2015-16 school year.

28.     The hostile work environment and discriminatory action by Respondents against Petitioner continued unabated into 2016.

29.     On April 4, 2016, Principal Chin told Petitioner that the evaluations that Petitioner had conducted of his teachers were deficient. Petitioner was taken aback by this and surprised, as

5

Principal Chin himself had reviewed Petitioner's evaluations over the preceding months and had never raised any issues.

30.     Two days later, on April 6, 2016, Principal Chin called Petitioner into a meeting with a talent coach assigned by the NYCDOE to Flushing High School, Tracy Atkins-Zoughlami. At that meeting, Petitioner was humiliated in front of an audience when he was told his observations were not written correctly and that his observations of the teachers in the department he was evaluating were rated too highly.

31.     Soon after, at a subsequent April 11, 2016 meeting, Principal Chin threatened that Petitioner should know what happened to Assistant Principal of Mathematics Gene Eyshinsky of Flushing High School, who had received a "U" rating last year for the 2014-2015 school year after giving the math teachers the math department all "Effective" and "Highly Effective" ratings, as Petitioner had done in the health and physical education department.   Like Petitioner, Mr. Eyshinsky was an over-50 year-old white male. Principal Chin also stated that Petitioner would probably be receiving an "Unsatisfactory" rating for the year.

32.     At the same April 11, 2016 meeting, Principal Chin further informed Petitioner that he believes the School Renewal Team would recommend that Petitioner be placed back in his licensed position of Assistant Principal of Security, thereby relieving Petitioner of his additional title of Assistant Principal of Supervision for Health and Physical Education.  In this way, the budget could be cut for Petitioner's AP Security position and Petitioner would be excessed from the school.

33.     In May 2016, Principal Chin directed Petitioner to obtain information on several teachers that Principal Chin purportedly did not like so that investigations could be opened into these individuals' conduct.

6

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 7 of 79

34.     Petitioner conducted investigations into these individuals, and concluded that they did not engage in the alleged misconduct.

35.     Nevertheless, and over Petitioner's objections, Principal Chin ordered Petitioner to draft letters to several of these teachers indicating that there was misconduct.

36.     On or about June 23, 2016, Petitioner received a Pedagogical Supervisory Personnel Report ("PSPR"), dated June 23, 2016, with an Unsatisfactory annual evaluation for the 2015-16 academic year. A copy of Petitioner's PSPR for the 2015-16 school year is annexed hereto as Exhibit F.

37.     Principal Chin never met with Petitioner to discuss the annual evaluation. Notably, Petitioner had always received an end-of-year meeting with his principals to discuss the annual evaluation.

38.     The Unsatisfactory rating was baseless, motivated only by Principal Chin's desire to push Petitioner out of Flushing High School. Indeed, Principal Chin even sent an email to the Flushing High School staff on June 28, 2016 that directly rebutted many of the claims contained in the PSPR. The emailed stated: "This year the school has shown improvements. The hallways are much better. ... during the Quality Review students, teachers and parents have stated that the tone of the school is much better." The email went on to note that there has been an improvement in attendance, and increase in Regents results, and that credit accumulation had shown improvement.

39.     Petitioner had never before been given an Unsatisfactory rating throughout his career.

40.     Due to his recognition that Principal Chin would continue his campaign to push Petitioner out, not wanting to be excessed to a new school, and the continued harassment he

7

Case 1:17-cv-08607-DLC Document 11-1 Filed 12/19/17 Page 8 of 79

faced by Principal Chin, Petitioner submitted his retirement papers at the end of the 2015-16 scfhool year and subsequently retired from the NYCDOE.

41.     Petitioner appealed his Unsatisfactory PSPR through the NYCDOE's Office of Appeals and Review and had a hearing on October 14, 2016. A copy of the transcript of that hearing, which is broken into two parts, is annexed hereto, collectively, as Exhibit G.

42.     Notably, at the hearing, Principal Chin acknowledged that he did not issue Petitioner a letter to file for his purported deficiencies in issuing evaluations, and that in fact Petitioner's practice improved. *See id.*

43.     Principal Chin also failed to identify the specific CSA articles that Petitioner purportedly violated that led to him receiving the aforementioned letters to file.

44.     In contrast, Petitioner credibly and articulately identified numerous areas of improvement at the school that were a direct result of his work. Petitioner also addressed the purported deficiencies contained in his PSPR, and why they were inaccurate. *See id.* Additionally, Petitioner noted how the superintendent and principal suspensions during the school year dramatically reduced, indicating that Petitioner's performance was satisfactory.

45.     On November 21, 2016, Philip Weinberg, the Deputy Chancellor for Teaching and Learning, issued Petitioner a letter informing him that his rating was sustained. A copy of this letter is annexed hereto as Exhibit H.

## AS AND FOR A FIRST CAUSE OF ACTION

46.     Petitioner repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

8

47.     Principal Chin's determination to give Petitioner an "Unsatisfactory" PSPR for the 2015-16 school year, and Respondents' determination to sustain the rating, is arbitrary, capricious, in bad faith, and in violation of lawful procedure.

48.     Courts have not been hesitant to overturn Unsatisfactory or Ineffective ratings of NYCDOE pedagogues when the decisions were clearly arbitrary, capricious, in bad faith, or in violation of the DOE's own lawful procedure. *See, e.g., Blaize v. Klein*, 68 A.D.2d 759 (2d Dep't 2009); *Lehman v. New York City Board of Education*, 82 A.D.2d 832 (2d Dep't 1981); *Loughlin v. New York City Board of Education*, Index No. 104708/09 (Sup. Ct. N.Y. Co. 3/31/10); *Smith v. New York City Board of Education*, 18 Misc.3d 192 (Sup. Ct. N.Y. Co. 2007); *Brown v. New York City Board of Education*, Index No. 113658/08 (Sup. Ct. N.Y. Co. March 24, 2010); *Spivak v. Cortines*, Index No. 5281/96 (Sup. Ct. Kings Co. 1996).

49.     As noted in the aforementioned paragraphs, the allegations made against Petitioner by Respondents are without merit. They are not based in fact; are rebutted by Principal Chin's own documents; and are in violation of Petitioner's rights under his CSA contract.

50.     Principal Chin sought to push Petitioner out of his school through a campaign of harassment, hostility, and also by forcing Petitioner to participate in Principal Chin's campaign against other teachers as well. Principal Chin succeeded in this, as Petitioner retired in August 2016.

51.     It is clear, however, upon reviewing the allegations made by Respondents against Petitioner and assessing the underlying facts regarding these allegations, that Petitioner's "Unsatisfactory" rating was wholly unwarranted.

52.     No prior application has been made herein.

9

53.     Petitioner has no other adequate remedy at law and the procedural vehicle of Article 78 is the only remedy available to her in order to seek the relief she requests in this special proceeding.

**WHEREFORE**, it is respectfully requested that this Court order Respondents to reverse and annul Petitioner's "Unsatisfactory" PSPR rating for the 2015-16 school year as well as the determination sustaining the appeal of his rating dated November 21, 2016, and restore any per session salary, benefits, and emoluments lost by Petitioner, as well as grant attorneys' fees, costs, and any other relief which is just and proper.

Dated:      New York, New York
            March 21, 2017

                        Yours, etc.,

                        GLASS KRAKOWER LLP
                        Attorneys for Petitioner
                        100 Church Street, Suite 800
                        New York, NY 10008
                        (212) 537-6859

            By:     _____
                        BRYAN D. GLASS, Esq.
                        Partner

10

**VERIFICATION**

STATE OF NEW YORK            )
                             )  ss:
COUNTY OF NEW YORK           )

Edward Coyne, being duly sworn, deposes and states that he is the Petitioner herein, that he has read the foregoing Verified Petition and knows the contents thereof, and states that the Verified Petition is true to his own knowledge.

_____
EDWARD COYNE

Subscribed and sworn to before
me this 20th day of March 2017

_____
Notary Public

ELLEN R. McCARTHY
Notary Public - State of New York
No. 02MC4951432
Qualified in Queens County
My Commission Expires Feb. 3, 2018

# EXHIBIT A

From: Wright Terri <_____.nyc.gov>
Sent: Thursday, June 25, 2015 9:03 AM
To: Coyne Jr Edward (25Q460)
Subject: APPT REQUEST WITH MR. CHIN

Mr. Coyne,

Mr. Chin is unable to meet with you today because he has several events scheduled today. He said that you may speak with him over the summer. If you do not work over the summer, you can feel free to come in to see him.

Terri Wright
Principal's Secretary
Flushing High School
35-01 Union Street
Flushing, NY 11354

(718) 888-7500 Ext. 1200

From: Coyne Jr Edward (25Q460)
Sent: Thursday, June 25, 2015 7:57 AM
To: Wright Terri
Subject: RE:

Thank you so much.

Ed Coyne
Assistant Principal Administration
Flushing High School

From: Wright Terri
Sent: Thursday, June 25, 2015 7:56 AM
To: Coyne Jr Edward (25Q460)
Subject: RE:
I don't know that he is scheduled to be in. I will have to check.

From: Coyne Jr Edward (25Q460)
Sent: Thursday, June 25, 2015 7:52 AM
To: Wright Terri
Subject: FW:

Please schedule me for an appointment with Principal Chin's today (Thursday).

Thank you.

Ed Coyne
Assistant Principal Administration
Flushing High School

From: Coyne Jr Edward (25Q460)
Sent: Wednesday, June 24, 2015 10:23 AM
To: Chin Tyee (03M415)
Subject:

Principal Chin,

I need to schedule a meeting with you tomorrow (Thursday, June 25, 2015) to discuss the proposed changes to the Deans' Office.

Thank you.

Ed Coyne
Assistant Principal Administration

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 16 of 79

Flushing High School

Sent: Thursday, June 25, 2015 7:52 AM
To: Wright Terri
Subject: FW:

Please schedule me for an appointment with Principal Chin's today (Thursday).

Thank you.

Ed Coyne
Assistant Principal Administration
Flushing High School

From: Coyne Jr Edward (25Q460)
Sent: Wednesday, June 24, 2015 10:23 AM
To: Chin Tyee (03M415)
Subject:

Principal Chin,

I need to schedule a meeting with you tomorrow (Thursday, June 25, 2015) to discuss the proposed changes to the Deans' Office.

Thank you.

Ed Coyne
Assistant Principal Administration
Flushing High School

Flushing High School
35-01 Union Street
Flushing, NY 11354
(718) 888-7500 Ext. 1200

From: Coyne Jr Edward (25Q460)
Sent: Thursday, June 25, 2015 7:55 AM
To: Wright Terri
Subject: RE:

Thank you so much.

Ed Coyne
Assistant Principal Administration
Flushing High School

From: Wright Terri
Sent: Thursday, June 25, 2015 7:56 AM
To: Coyne Jr Edward (25Q460)
Subject: RE:

I don't know that he is scheduled to be in. I will have to check.

From: Coyne Jr Edward (25Q460)

# EXHIBIT B

## Your Continued Assistance Requested

**Coyne Jr Edward (25Q460)**
**Sent:** Monday, October 19, 2015 9:23 PM
**To:** bob@csa-nyc.org
**Cc:** sana@csa-nyc.org

Dear Bob:

Please see the attached email I received from Principal Chin this morning, after I spoke with you.

At no time did I not allow a student entry to Flushing High School. Nor did I at any time allow a student to leave before his/her scheduled class day was over. Camera documentation proves that, once again, Principal Chin's allegations that I engaged in misconduct are entirely baseless.

Principal Chin cannot be allowed to continue to harass me. The hostile work environment he is imposing upon me is unacceptable.

Please advise. I look forward to hearing from you as soon as possible.


Ed Coyne
Assistant Principal Administration
Flushing High School

From: Chin Tyee (25Q460)
Sent: Monday, October 19, 2015 9:06 AM
To: Coyne Jr Edward (25Q460)
Subject: Refusing entry for students

Mr. Coyne

It has come to my attention, that during the PSAT testing students were not allowed entry into the building because they were late. Ms. Cuti and the level III confirmed this to be true. They also confirm that you instructed agents to allow students to leave at the end of PSAT testing, if they were finish with their day. During our cabinet meeting, on Monday October 12, this was discouraged. Approximately 150 students were allowed to leave the building at 12:11pm. As you know, FHS is a renewal school and all students are expected to participate in ELT. This means that no student should have a reduced schedule. No student should be allowed to leave early. I also spoke with you in September about refusing entry to students.

Please consider this a formal written notice that no student is to be refused entry into the building as per DOE regulation. If anyone is found refusing students entry into the building, they will be scheduled for a disciplinary conference which could lead to a letter to file and other disciplinary actions.

Thank you for your attention to this matter.

Tyee Chin
Principal
Flushing High School

Confidentiality Notice: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify me immediately by replying to this message and deleting it from your computer. Thank you.

https://mail.nycboe.net/owa/?ae=Item&amp;t=IPM.Note&amp;id=RgAAAAB5%2bUV0...    10/20/2015

FILED: NEW YORK COUNTY CLERK 03/21/2017 12:20 PM
INDEX NO. 152634/2017
NYSCEF DOC. NO. 1
Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 22 of 79
RECEIVED NYSCEF: 03/21/2017

RE: Refusing entry for students
Page 1 of 1

## RE: Refusing entry for students

**Coyne Jr Edward (25Q460)**
**Sent:**          Tuesday, October 20, 2015 10:10 AM
**To:**            Chin Tyee (25Q460)
**Attachments:** Rebuttal.docx (19 KB)

Attached is my response.

Ed Coyne
Assistant Principal Administration
Flushing High School

**From:** Chin Tyee (25Q460)
**Sent:** Monday, October 19, 2015 9:06 AM
**To:** Coyne Jr Edward (25Q460)
**Subject:** Refusing entry for students

Mr. Coyne

It has come to my attention, that during the PSAT testing students were not allowed entry into the building because they were late. Ms. Cuti and the level III confirmed this to be true. They also confirm that you instructed agents to allow students to leave at the end of PSAT testing, if they were finish with their day. During our cabinet meeting, on Monday October 12, this was discouraged. Approximately 150 students were allowed to leave the building at 12:11pm. As you know, FHS is a renewal school and all students are expected to participate in ELT. This means that no student should have a reduced schedule. No student should be allowed to leave early. I also spoke with you in September about refusing entry to students.

Please consider this a formal written notice that no student is to be refused entry into the building as per DOE regulation. If anyone is found refusing students entry into the building, they will be scheduled for a disciplinary conference which could lead to a letter to file and other disciplinary actions.

Thank you for your attention to this matter.

**Tyee Chin**
**Principal**
**Flushing High School**

Confidentiality Notice: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify me immediately by replying to this message and deleting it from your computer. Thank you.

https://mail.nycboe.net/owa/?ae=Item&amp;t=IPM.Note&amp;id=RgAAAAB5%2bUV0...   10/20/2015

October 20, 2015

Principal Chin,

At no time did I not allow a student entry to Flushing High School; nor allow a student to leave before their scheduled class day was over. Camera documentation proves that your allegations are once again false as to the facts.

As per the PSAT schedule distributed with your name the following policies were put in place by you:

1. Sophomores and Juniors were allowed in the building through Exit 15 starting at 8 am and as per your written instructions, "Proctors will not admit students after 8:45 am."

2. Freshman were allowed in the building through Exit 15 at 8 am and directed to the auditorium and as per your written instructions "No Admittance after 9:45 am."

3. Seniors were allowed in the building through Exit 15 at 8 am and as per your written instructions "No admittance after 8:45 am."

4. Exit 15 was closed at approximately 9:45 am at which time all students who arrived after 9:45 am were instructed to swipe in at Exit 16. Exit 15 was closed and students directed to Exit 16 to allow the Freshman Academy free movement to and from the auditorium and gym; as well as allowing seniors free movement to and from the cafeteria, auditorium, library and room 501.

5. At approximately 9:45 am, AP Cuti, AP Katcher and myself met at Exit 15 and agreed on closing Exit 15 and allowing students to enter through Exit 16 (Camera CI-24).

6. Students are seen on camera (C1-28) entering Exit 16 at 9:49 am, 10:00 am, 10:15 am, 10:47 am, 11:23 am and 11:31 am, with AP Cuti often escorting the students into the school; however, many of the students are seen on camera not swiping their IDs in to the CAASS machine which was stationed at Exit 16.

7. Regarding your allegation that 150 students were allowed to leave the building at 12:11 pm camera footage (C1-28 from 12:11 pm to 12:15 pm) clearly shows that students were not allowed to leave the building through Exit 16 as SSA Garcia and SSA Hull stopped students from leaving the building, and were soon assisted by SSA Level 3 and other agents.

8. Camera C1-24 (at Exit 15) shows AP Coyne informing students at 11:51 am that they may not leave the building. AP Coyne then enters his office with a student at 11:52 am, who allegedly had a problem with a staff member in the gym.

9. At approximately 11:53 am SSA Level 3 is seen on camera (C1-24) speaking with SSA Nicholson who appears to disarm the doors at Exit 15. At 11:53:37 am approximately 25 students (not 150) leave the building; whereupon, 5 re-enter the building immediately. At 11:54:58 am, AP Cuti arrives at Exit 15.

10. SSA Nixon leaves Exit 15 at 11:56 am (C1-24) and at 11:57:23 am, approximately 11 students leave through Exit 15, with 7 re-entering when caught outside by AP Cuti.

Edward J. Coyne, Jr.
Assistant Principal Administration

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 24 of 79

# EXHIBIT C



# Flushing High School

**Tyee Chin, Principal**

*Home of the Red Devils*

35 – 01 Union Street, Flushing, New York 11354 • (718) 888-7500 • FAX (718) 886 – 4255
**"Devoted to academic excellence, self-awareness, creativity and critical thinking"**

January 4, 2016

**Mr. Edward Coyne**
**Assistant Principal Organization**
**File #** ░░░░░░░

Dear Mr. Coyne:

On December 1, 2015 I met with you and your CSA representative to discuss your failure to attend Parent Teacher Conferences on November 19, 2015.

As you are aware, on November 19, 2015, you were contractually obligated to attend Flushing High School's Parent Teacher Conference. At approximately 5:40pm I tried to find you to discuss an incident involving one of Flushing's students at another school in Queens. I was told by Dean Carlomusto that you had a family emergency and would not be at Parent Teacher Conferences.

When we spoke on December 1, 2015, you explained that you were visiting your mother in the hospital and got a call that your wife was sick. You explained that you were unable to attend the PTC because you had to take care of personal business and you were unable to contact me until after 9pm on November 19, 2015. You also stated that you contacted Dean Margolin and informed him that you would not be available. I expressed my concerns that you were able to contact the deans but not your direct supervisor. You stated, "I understand that I made a mistake and I will take the hit for this."

When we spoke, I reiterated that it is essential for us as educators to fulfill our contractual obligations and that you are expected to contact your direct supervisor if you are having an issue. I also expressed the fact that it is inappropriate to contact the deans and not the principal. We have discussed this issue in the past.

Based on our meeting, a review of the issue we discussed and your responses at our meeting, I conclude that on November 19, 2015, you failed to attend Parent Teacher Conferences and failed to notify me, your immediate supervisor. I understand that you had a family emergency but you called a Dean rather than your immediate supervisor which is unacceptable. Going forward, you are to contact me, your immediate supervisor, in the event you are unable to fulfill your duties and responsibilities.

Your cooperation is appreciated and is necessary for the efficiency and effectiveness of our school community.

Sincerely,

Tyee Chin

Principal
Flushing High School

I have read and received a copy of this letter and understand that a copy will be placed in my official personnel file.

_____                    _____
Assistant Principal Signature                              Date

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 26 of 79

# EXHIBIT D



## Flushing High School

*Home of the Red Devils*

**Tyee Chin, Principal**

35 – 01 Union Street, Flushing, New York 11354 • (718) 888-7500 • FAX (718) 886 – 4255
**"Devoted to academic excellence, self-awareness, creativity and critical thinking"**

January 4, 2016

**Mr. Edward Coyne**
**Assistant Principal Organization**
**File #** ▮▮▮▮▮▮

Dear Mr. Coyne:

On December 1, 2015 I met with you and your CSA representative to discuss two incidents not entered in OORs within 24 hours.

We discussed the following two incidents. 1) You had a LODI incident form completed relating to an injury you sustained in a classroom on Monday November 30, 2015, dealing with a student. 2) There was a fight at the end of the day on Monday November 30, 2015. Both of these incidents were not entered into OORS in a timely manner as required.

At our meeting, you explained that both incidents were being investigated by Dean Margolin. You also stated that you were not aware that they were not entered. You stated that the deans' were given training and understood that all incidents must be reported within 24 – 48 hours. You stated that you were not in the building for two days because of your injury so you could not review OORS. I spoke with Dean Margolin and he was not aware that he was expected to enter the reports. He was under the impression that he was only to investigate the incident. He informed me that the previous practice was that you enter all reports in OORS.

I explained to you that the expectation is that all deans must be given the ability to enter information in OORS. You explained that this was done for all deans except Dean MacKay, because she is having technical difficulties.

I conclude that this was a lack of clear communication between you and Dean Margolin. Please ensure that all incidents are reported into OORS as required.

Your cooperation is appreciated and is necessary for the efficiency and effectiveness of our school community.

Sincerely,

Tyee Chin

Principal
Flushing High School

I have received a copy of this memo.

_____          ____1-7-16____
Assistant Principal Signature                        Date

# EXHIBIT E



# Flushing High School
## Tyee Chin, Principal

*Home of the Red Devils*

35 – 01 Union Street, Flushing, New York 11354 ● (718) 888-7500 ● FAX (718) 886 – 4255
**"Devoted to academic excellence, self-awareness, creativity and critical thinking"**

January 4, 2016

**Mr. Edward Coyne**
**Assistant Principal Organization**
**File #** ▊▊▊▊▊▊

Dear Mr. Coyne:

On December 1, 2015, I met with you and your CSA representative to discuss that you assigned per session to two of our deans without written approval.

As you are aware, on November 19, 2015, I met with you, AP Cuti and AP Katcher to discuss plans for Parent Teacher Conference. During that meeting, there was no discussion about having deans work per session. We discussed having the school aides and paraprofessionals work per session.

Before Parent Teacher Conferences on November 19, 2015 at 5:00pm, I noticed that two deans were working per session. I also noticed that you signed one of the dean's time sheets to approve the per session activity. I reminded you that no staff member should be assigned per session without my written approval. I also reminded you that this was the second time I was discussing this practice with you. When we spoke, I reiterated that it is essential for us as supervisors; to adhere to the proper procedures. I reminded you that if there is no posting for per session then teachers cannot get paid. I also expressed concerns about you delivering mixed messages to the staff when you do not follow the procedures.

At our meeting, you stated, "I agree that I should have contacted you first and get approval for per session." You also expressed that you understood the importance of accurate budgetary allocations. Your union representative stated to you, "You need to understand that there are new rules in place and we cannot keep following the old procedures."

Based on our meeting, a review of the issue we discussed and your responses at our meeting, I conclude on November 19, 2015, you were insubordinate when you assigned deans to work per session without my prior written approval and after we discussed earlier that day that school aides and paraprofessionals would work per session. Going forward, you are not to assign any staff to work per session unless you have my prior written approval.

Please be advised that the above misconduct may lead to further disciplinary action, including an unsatisfactory rating and charges that could lead to your termination.

Your cooperation is appreciated and is necessary for the efficiency and effectiveness of our school community.

Sincerely,

Tyee Chin
Principal
Flushing High School

I have read and received a copy of this letter and understand that a copy will be placed in my official personnel file.

_____
Assistant Principal Signature

_____1-7-16_____
Date

# EXHIBIT F



**NEW YORK CITY DEPARTMENT OF EDUCATION**
**DIVISION OF HUMAN RESOURCES**
**65 COURT STREET, BROOKLYN, NEW YORK 11201**
**OP 352 (04/14)**

**PEDAGOGICAL SUPERVISORY**
**PERSONNEL REPORT**
**SECTION A: PERFORMANCE PLANNING**

| EMPLOYEE'S FULL NAME | LICENSE/ASSIGNMENT | | BIS ID | EMPL ID | SCHOOL YEAR |
|---|---|---|---|---|---|
| COYNE JR EDWARD | AP01 - A P ADMINISTRATION | | | | 2016 |
| EMPLOYEE'S COMPLETE HOME ADDRESS | APT.No | CITY | STATE | | ZIP CODE |
| 217-23ROCKAWAY POINT BLVD | | BREEZY POINT | NY | | 11697 |
| STATUS | TENURED | PROBATIONER | ASSIGNMENT DATE UNDER | HIRING MANAGER | |
| TRH - TRF HDQ REOG | ☒ | ☐ | CURRENT LICENSE: 03/28/2001 | | |
| BFSC | SCHOOL/OFFICE/BUREAU | | | BOROUGH | DISTRICT |
| QFSN | Q460 - FLUSHING HIGH SCHOOL | | | QUEENS | 25 |

### SECTION 1 – GOALS AND OBJECTIVES

---

**SPECIFIC ASSIGNMENT:**

*see attachment*

---

**GOAL A** | **TO IMPROVE INSTRUCTIONAL AND SCHOOL PROGRAMS**

OBJECTIVES:

*see attachment*

---

**GOAL B** | **TO ACHIEVE EFFECTIVENESS IN ADMINISTRATION FUNCTIONING**

OBJECTIVES:

*see attachment*

---

**GOAL C** | **TO INITIATE AND STRENGTHEN STAFF ACTIVITIES**

OBJECTIVES:

*see attachment*

---

OP352A

Page 1of 3

Last Name **COYNE JR**        First Name **EDWARD**   EIS ID          Print Date **06/22/16**

| GOAL D | TO IMPROVE RELATIONSHIPS WITH STAFF, STUDENTS, PARENTS AND COMMUNITY |
|---|---|
| | OBJECTIVES: |
| | *See attachment* |

| GOAL E | OTHERS |
|---|---|
| | OBJECTIVES: |
| | *See attachment* |

**SECTION 2 – SUMMARY**

**END OF YEAR SUMMARY** (To be filled out by Evaluating Supervisor.) Please include a summary of strongest assets and areas for future concentration. Indicate whether the supervisor's performance exceeded expectations, met expectations, or was below expectations within the framework of operations and taking into account factors (or constraints) over which the individual has no control. (Additional pages may be added, if needed.)

*See attachment*

OP352A

Last Name _____ **COYNE JR** _____ First Name _____ **EDWARD** _____ EIS ID _____ Print Date ___**06/22/16**___

## SECTION 3 – SIGNATURES

| | | |
|---|---|---|
| Signature of Supervisor who is being reviewed | | Date Signed _____ |
| Signature of Evaluating Supervisor | | Date Signed __*6/22/16*__ |
| Signature of Superintendent or Executive Director | | Date Signed _____ |

If desired, the Supervisor who is being reviewed may attach his/her own statement to become part of the record.

☐ Supervisor's Copy          ☐ School/Office/Bureau          ☐ Supt./Exec.Director

## SECTION 4- RULES AND INSTRUCTIONS

All information requested on top of form (name, address, etc.) must be filled out.

**Goals and Objectives:**

The performance goals are based on the major areas of responsibility of supervisors and are to be prepared *in consultation* with the supervisor whose performance is being reviewed. The form suggests four specific areas and allows for any others you wish to develop. Since there are many different types of supervisory positions, in certain cases a particular goal may not be applicable. Therefore, the Supervisor need only fill out objectives for goals that are appropriate and applicable to his/her position. The number and nature of the objectives may also vary depending upon the requirements of that position. Periodically, objectives may be modified or eliminated due to a variety of reasons or constraints.

Listed below are the four areas suggested with an explanation of each:

| GOAL A | **TO IMPROVE INSTRUCTIONAL AND SCHOOL PROGRAMS.** This includes, to the extent applicable, effectiveness in curriculum development and implementation,  teacher training, selecting and using instructional materials, meeting individual and group needs, motivating students to achieve, guidance, discipline, testing, co-curricular activities, etc. |
|---|---|
| GOAL B | **TO ACHIEVE EFFECTIVENESS IN ADMINISTRATION.** This includes effectiveness in planning, organizing, leading, following-up, controlling, and establishing management procedures for record-keeping, reports, correspondence, security, school plant operation, etc. |
| GOAL C | **TO INITIATE AND STRENGTHEN STAFF ACTIVITIES.** This includes effectiveness in selecting, training, evaluating and supporting staff. In this regard consider objectivity, sensitivity, morale building, participation, incentives, firmness, cooperation, etc. |
| GOAL D | **TO IMPROVE RELATIONSHIPS WITH STAFF, STUDENTS, PARENTS, AND COMMUNITY AT LARGE.** This includes relations at all levels, i.e., pupils, parents, teachers, paraprofessionals, supervisors, community school boards, communities, other departments or agencies and professional organizations. |

**End of Year Summary**

To be prepared *in consultation* with supervisors whose performance is being reviewed. Where future concentration is required, specific recommendations should be noted. If more space is needed, please attach additional information to this form.

**THE INFORMATION FROM THIS SECTION SHOULD BE TAKEN INTO CONSIDERATION WHEN COMPLETING SECTIONS B AND C OF THIS PEDAGOGICAL SUPERVISORY PERSONNEL REPORT**

OP352A

NEW YORK CITY DEPARTMENT OF EDUCATION
DIVISION OF HUMAN RESOURCES
65 COURT STREET, BROOKLYN, NEW YORK 11201
OP 352 (04/14)

PEDAGOGICAL SUPERVISORY
PERSONNEL REPORT
SECTION B: SUPERVISORY RATING

| EMPLOYEE'S FULL NAME | | LICENSE/ASSIGNMENT | | EIS ID | EMPL ID | SCHOOL YEAR |
|---|---|---|---|---|---|---|
| COYNE JR EDWARD | | AP01 - A P ADMINISTRATION | | | | 2016 |

| STATUS | | TENURED | PROBATIONER | CURRENT SALARY RATE | HIRING MANAGER |
|---|---|---|---|---|---|
| TRH - TRF HDQ REOG | | ☒ | ☐ | $115,343.00 | |

| BFSC | SCHOOL/OFFICE/BUREAU | BOROUGH | DISTRICT |
|---|---|---|---|
| QFSN | Q460 - FLUSHING HIGH SCHOOL | QUEENS | 25 |

ATTENDANCE RECORD AS OF: 06/30/16

CURRENT YEAR TIME LOST

| | LATENESS | | | ABSENCE | | | DAYS IN C.A.R | OR BORROWED DAYS |
|---|---|---|---|---|---|---|---|---|
| TIMES NO | DAYS | HOURS | MIN | TIMES NO | DAYS | HOURS | MIN | |
| | 0 | 0 | 0 | | 3 | 0 | 0 | 110 | |

## SECTION 1- PERFORMANCE EVALUATION RATING

PERFORMANCE EVALUATION:

Signature and title of rating officer _____ *[signature]* _____ Principal _____ Date 6/22/16

OVERALL EVALUATION S, U, or T (T for first year probation only) [U]

For the period: from 09/01/2015 to 08/31/2016

WHEN RATING IS U OR T: The rating officer must list below the reasons, facts and conditions on which the U or T rating is based. If there is insufficient space to complete the list below, additional pages may be attached and should be identified with the name and EIS ID number of the rated supervisor and attached in the proper sequence to this report. A rating of T may be used only for a probationer during the first year of probation provided that the probationary service is to continue for more than one year.

## SECTION 2 – DOCUMENTATION

| Reason number | Statement of reasons* |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

*See Rules and Instructions

## SECTION 3 - SIGNATURES

ACKNOWLEDGEMENT OF RECEIPT: I have received the foregoing individual rating information with statement of reasons, and am aware that my signature does not necessarily indicate agreement with the contents of this report.*

Signature of Rated Supervisor _____ *[signature]* _____ Date Signed 6/23/16

| ☐ Supervisor's Copy | ☐ School/Office/Bureau | ☐ Supt. Exec. Director |
|---|---|---|

OP352B

Last Name _____ **COYNE JR** _____    First Name ___ **EDWARD** ___    EIS ID _____    Print Date __**06/22/16**__

## SECTION 4 – RULES AND INSTRUCTIONS

**IN COMPLETING THIS SECTION, CONSIDERATION MUST BE GIVEN TO SECTION A - PERFORMANCE PLANNING**

| | |
|---|---|
| 1. | **INDIVIDUAL RATINGS:** Except for certain probationers, all pedagogical supervisory personnel are to be rated either Satisfactory (S) or Unsatisfactory (U). A probationer whose probationary service will extend for more than one year may be rated Doubtful (T) during the first year of probationary service. <br><br> **WHEN INDIVIDUAL RATING REPORT IS TO BE ISSUED:** The rating officer is to ensure receipt of the Individual rating report within the last ten (10) school days of each school year but not fewer than four (4) school days prior to the close of that school year. When service in a given school covers at least twenty (20) school days in a school year and terminates other than at close of that school year, the individual rating report must be given to the employee not later than four (4) school days following the last day of service in that school/office/bureau. |
| 2. | **COPIES REQUIRED:** If an employee received a Satisfactory (S) rating, a copy should be given to the employee and a copy should be maintained in the supervisors personnel file. If an employee receives an adverse rating additional copies must be sent to the Superintendent/Executive Director, the Office of Appeals and Reviews, 65 Court Street, Room 717, Brooklyn, New York 11201 and the Office of Supervisory Support Services, Division of Human Resources, 65 Court Street, Room 405, Brooklyn, New York 11201. |
| 3. | **STATEMENT OF REASONS AND ACKNOWLEDGEMENT OF ADVERSE RATING REPORT:** No Statement of Reasons or Acknowledgement by the rated employee is required except for adverse ratings (T or U). Should the rated employee refuse to acknowledge receipt of an adverse rating report, the report is to be given to the employee in the presence of witnesses who will attest to such delivery in writing and such attestation is to be attached to the copies of the report which are retained in the school/office or forwarded for action. The Statement of Reasons should list only the major area of weaknesses or incompetence and should not give any specifics or elaboration of the reasons. These would be contained in the documentation which is to be sent only in response to an appeal. |
| 4. | **APPEAL OF ADVERSE RATING REPORT:** An appeal from an adverse rating must be made by the rated employee to the Chancellor in writing, with a copy to the rating officer. It is to be sent to the Director of the Office of Appeals and Reviews, for the Chancellor. This must be done within three (3) weeks (exclusive of summer vacation) after receipt of such adverse rating. |
| 5. | **CUMULATIVE ABSENCE RESERVE:** The Cumulative Absence Reserve (CAR) may be no more than a maximum of two hundred (200) days for regular employees. |
| 6. | **BORROWED DAYS:** Regular employees may borrow a maximum of twenty (20) days. |

Page 2 of 2

OP352B

Last Name __**COYNE JR**__   First Name __**EDWARD**__   EIS ID _____   Print Date __**06/22/16**__

## SECTION 3 – SIGNATURES

Signature of Supervisor who is being reviewed        Date Signed  6/23/16

Signature of Evaluating Supervisor        Date Signed  6/22/16

Signature of Superintendent or Executive Director        Date Signed _____

If desired, the Supervisor who is being reviewed may attach his/her own statement to become part of the record.

☐ Supervisor's Copy      ☐ School/Office/Bureau      ☐ Supt./Exec.Director

## SECTION 4- RULES AND INSTRUCTIONS

All information requested on top of form (name, address, etc.) must be filled out.

### Goals and Objectives:

The performance goals are based on the major areas of responsibility of supervisors and are to be prepared _in consultation_ with the supervisor whose performance is being reviewed. The form suggests four specific areas and allows for any others you wish to develop. Since there are many different types of supervisory positions, in certain cases a particular goal may not be applicable. Therefore, the Supervisor need only fill out objectives for goals that are appropriate and applicable to his/her position. The number and nature of the objectives may also vary depending upon the requirements of that position. Periodically, objectives may be modified or eliminated due to a variety of reasons or constraints.

Listed below are the four areas suggested with an explanation of each:

| GOAL A | **TO IMPROVE INSTRUCTIONAL AND SCHOOL PROGRAMS.** This includes, to the extent applicable, effectiveness in curriculum development and implementation,  teacher training, selecting and using instructional materials, meeting individual and group needs, motivating students to achieve, guidance, discipline, testing, co-curricular activities, etc. |
|---|---|
| GOAL B | **TO ACHIEVE EFFECTIVENESS IN ADMINISTRATION.** This includes effectiveness in planning, organizing, leading, following-up, controlling, and establishing management procedures for record-keeping, reports, correspondence, security, school plant operation, etc. |
| GOAL C | **TO INITIATE AND STRENGTHEN STAFF ACTIVITIES.** This includes effectiveness in selecting, training, evaluating and supporting staff. In this regard consider objectivity, sensitivity, morale building, participation, incentives, firmness, cooperation, etc. |
| GOAL D | **TO IMPROVE RELATIONSHIPS WITH STAFF, STUDENTS, PARENTS, AND COMMUNITY AT LARGE.** This includes relations at all levels, i.e., pupils, parents, teachers, paraprofessionals, supervisors, community school boards, communities, other departments or agencies and professional organizations. |

### End of Year Summary

_To be prepared in consultation with supervisors whose performance is being reviewed. Where future concentration is required, specific recommendations should be noted. If more space is needed, please attach additional information to this form._

**THE INFORMATION FROM THIS SECTION SHOULD BE TAKEN INTO CONSIDERATION WHEN COMPLETING SECTIONS B AND C OF THIS PEDAGOGICAL SUPERVISORY PERSONNEL REPORT**

OP352A



# Flushing High School

**Home of the Red Devils**

**Tyee Chin, Principal**

35 – 01 Union Street, Flushing, New York 11354 • (718) 888-7500 • FAX (718) 886 – 4255
**"Devoted to academic excellence, self-awareness, creativity and critical thinking"**

## Assistant Principal Goals and Objectives (SY 15 – 16)

**Assistant Principal's Name:  Edward J. Coyne, Jr.**

**Department: Deans Office and Physical Education and Health**

**Major Responsibilities: Administrative Duties**

**Date: Wednesday, June 22, 2016**

**Specific Assignment:**  You are assigned as the Assistant Principal of Security and Physical Education. You are responsible for completing the school safety plan and act as the principal designee for investigations and all activity relating to school safety such as fire drills, safety meetings and suspensions.

On November 5th, 2015, we met to discuss your goals and objectives.  You submitted your goals prior. You submitted your duties and responsibilities.  Suggested revisions were given to create goals that were aligned to the RSCEP and renewal benchmarks.  You were expected to create SMART goals with measurable outcomes.  On March 18th, 2016 we met to discuss your mid-year assessment of these goals.  During this meeting we discussed the results from observation reports, scholarship reports and how graduation completion.   We also discussed meeting with individual teachers to create a targeted intervention plan for all seniors needing the regents to graduate.  You expressed concerns around the physical education grading policy and prepareness.  Below please find your goals and my feedback.

| GOAL A: | TO IMPROVE INSTRUCTIONAL AND SCHOOL PROGRAMS:  *This includes, to the extent applicable, effectiveness in curriculum development and implementation, teacher training, selecting and using instructional materials, meeting individual and group needs, motivating students to achieve, guidance, discipline, testing, co-curricular activities, etc. **Please enter your goals & objectives below.*** |
|---|---|
| | 1. To create a safe and secure facility in which Flushing High School's (FHS) educational vision is attained using OORS and SOHO data to identify areas of need and school safety; reduce suspensions by 10% through implementing progressive discipline. |
| | 2. To create a "Restorative Justice" Program for FHS by September 2016. |
| | 3.  To increase student participation in physical education and health classes by 10%. |

|  | **Motivating students to achieve:** There has been a decrease in the number of Principal suspensions, however, there has been an increase in the number of Superintendent suspensions as reflected in OORS (see attachment). You were not able to achieve your goal of creating a "Restorative Justice" Program. The STARS report shows an increase in the number of students passing Physical Education (see attachment). |
|---|---|
| **GOAL B:** | **TO ACHIEVE EFFECTIVENESS IN ADMINISTRATION:** *This includes effectiveness in planning, organizing, leading, following-up, controlling, and establishing management procedures for record-keeping, reports, scholarship reports, monitoring, correspondence, security, school plant operation, etc.* **Please enter your goals & objectives below.** <br><br> 1. Scholarship reports for the 1st and 2nd marking periods will be analyzed to show a 5% increase in the number of students gaining credits. <br> 2. To work very closely with the Assistant Principals, SLC Directors, Deans, Guidance Counselors, and School Safety Agents (SSAs) in establishing a uniform discipline policy in which standards of behavior are set, monitored, and achieved through the maintenance of categorical statistics to determine trends in school tone. <br><br> **Management procedures:** The scholarship report shows an increase in credits, however, it was lower than a 5% increase. You actively worked with the SLC Directors, Deans, Guidance Counselors and School Safety Agents. The tone of the building has improved. However, the number of suspensions only shows a small improvement. |
| **GOAL C:** | **TO INITIATE AND STRENGTHEN STAFF ACTIVITIES:** *This includes effectiveness in selecting, training, evaluation and supporting staff. In this regard consider objectivity, sensitivity, morale building, participation, incentives, firmness, cooperation, etc.* **Please enter your goals & objectives below.** <br><br> 1. To provide professional development by conducting training for staff and SLCs on classroom management, fire drills, and lockdown procedures. <br> 2. On a daily basis, to ensure that safety and security is maintained by Deans, SSAs, and the Assistant Principal of Security being more visible on the perimeter, at school entry and dismissal, and in the hallways and cafeteria. <br><br> **Training:** You were successful at providing the training indicated above. Members of the Dean's office and SSA were visible but the level of effectiveness was not consistent. |
| **GOAL D:** | **TO IMPROVE RELATIONSHIPS WITH STAFF, STUDENTS, PARENTS, AND COMMUNITY AT LARGE:** *This includes relations at all levels, i.e., pupils, parents, teachers, paraprofessionals, supervisors, community-based organizations, communities, other departments or agencies and professional organizations.* **Please enter your goals & objectives below.** |

|  |  |
|---|---|
|  | 1. To use SKEDULA to promote a dialogue among parents, students, and school community members centered on student learning and success.<br>2. To effectively use SKEDULA to determine alternatives to suspension, and reduce truancy and walking in the hallways.<br>3. To effectively use Phonemaster to reduce lateness to the school and increase student attendance.<br><br>**You were successful at achieving this goal.** |
| **GOAL E (OTHER):** | **You received two letters to file concerning the effectiveness of reporting incidents in OORS in a timely fashion and your poor judgment in informing me of your absence (see attachment).**<br><br>**You mismanaged investigating and documenting an OSI investigation. After giving direct instructions from the Office of Legal Services about how to conduct the investigation and provide a letter for file to be reviewed, you ignored the directives. This action caused the school to redact the letter and provide a new letter to both teachers. You were successful at achieving some of your goals, however, you struggled with accurately observing Physical Education teachers and providing evidence to support your rating. Because of your level of displaying ineffective leadership qualities, you are not able to receive a satisfactory rating.** |

Tyee Chin


Principal
**Flushing High School**

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 40 of 79

# EXHIBIT G

Chairperson:  Record at 9:16 a.m. on October 14, 2016.  We are meeting pursuant to Article 4, Section 4.3.2 of the Bylaws of the Department of Education to review an appeal from a rating of unsatisfactory given by Tyee Chin, the principal of Flushing High School, Q460 in the geographic District 25 and Queens High School District, to Edward Coyne for the period ending June 30, 2016.  The appellant is employed as an assistant principal, administration, serving under file number ▮▮▮▮.  I am Joseph Caldone, chairperson on this Chancellor's Committee.  I now ask each of you to identify yourself for the record and just *[indiscernible] [00:00:51]* you are here.  Mr. Chin, we'll begin with you.  Would you please say your first and last name as well as your title?

Tyee Chin:  This is Tyee Chin. I'm the principal of Flushing High school.

Chairperson:  Okay.

Jermaine Garden:  Jermaine Garden, CSA representative.

Chairperson:  Okay.

Edward Coyne:  Edward Coyne, assistant principal, administration.

Chairperson:  Okay, sir.  During this review, Mr. Coyne, I would refer to you as the appellant.  I'll briefly review the format of this review.  We'll begin with procedural objections and I'll respond to each one.   We'll then have a presentation by the administration followed by cross-examination by the CSA advisor.  We'll then have a presentation by the CSA advisor, Angela Callan followed by cross-examination by the administration if he chooses to do so.  We'll then have a concluding statement by the rating officer followed by a concluding statement by the CSA advisor Angela Callan.  Two additional points to mention, audio recording being made by this law office is the only official recoding of this review and it is expected that all participants will conduct themselves with a courtesy and professionalism that this venue deserves.  That being said, we move on to procedural objections, if any?

Jermaine Garden:  Yes, sir.  I'd like to bring your attention and everyone's attention to our item 1.0.  Look, we have seen statement of reasons.  There are no statement of reasons listed on the official rating form.

Chairperson:  Okay.  That is noted for the record but the ratings used a legal document such it can't be removed from the review but your *[overlapping conversation] [00:02:32]*.

Jermaine Garden:  And item 2.1 and there will be a summary unless I missed this somewhere, I had seen it.  It says see attachment but I don't see.

Chairperson:  Okay, Mr. Chin.

Tyee Chin:  Here are the attachments 2.3, 2.4, 2.5, 2.6.

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 42 of 79

Jermaine Garden:  I see the goals, objectives.  Where is the end of year summary?

Tyee Chin:  If you see, if you will notice in the summary, what you will see is that the goals are in the beginning on each of them and then the summary is at the end of each of them.  So where you will see the year as bold, for instance in 2.3.

Jermaine Garden:  Okay.  I see how you wrote it but I am not used to seeing written that way.

Tyee Chin:  There is no particular method adopted here.

Chairperson:  Yeah, it's acceptable.  He writes see attachment and it's all part of dark in number 2.  So, you know, it's fine if you wanted a clarification but I think that's an acceptable explanation.

Jermaine Garden:  No, I am not happy with it --

Tyee Chin:  Pardon me.  The system doesn't allow you to type into it. When I got it, when it's printed, I'll prompt the secretary.

Jermaine Garden:  Plenty of people type this all that time.

Tyee Chin:  I am telling you, my secretary when she printed out --

Jermaine Garden:  Oh, your secretary, right?

Tyee Chin:  Yeah.

Chairperson:  Okay.  It's acceptable, so that's fine.

Tyee Chin:  He accepted it.  I am not going to let him touch that.

Jermaine Garden:  Now I also want *[indiscernible] [00:04:19]* a copy of the rating sheet that I saw didn't have – it still doesn't have a superintendent signature for 2.2.  There is no superintendent signature noted.

Chairperson:  Well, there are three dates, so are those three signatures?

Tyee Chin:  Yeah.  There are two dates.

Jermaine Garden:  Two dates?

Chairperson:  Well, there are three lines for dates, I see six.

Tyee Chin:  Right.  It was forwarded to the superintendent?

*Transcribed by Transcription HUB*                                        www.TranscriptionHUB.com

Jermaine Garden: 2.2.

Chairperson: Look at 2.2b.

Tyee Chin: You will see the superintendent signature on the next one.

Jermaine Garden: Who is the superintended?

Tyee Chin: Michael Arkof.

Jermaine Garden: Okay, I signed that on 6/29. So you have two in it, okay?

Chairperson: Yeah, I submitted all the documentation the school sent and then we can discuss it as we go along.

Jermaine Garden: And the last procedural objective I have is we object to emails being included in the packet and I am looking specifically at email 5.1 – emails and, yeah, 5.1 which is an email. Objection, because emails are normally just where principal and assistant principal are communicating *[indiscernible] [00:05:56]*.

Chairperson: Emails are accepted as admission into reviews at this office. That's the policy of this office. Emails are acceptable.

Jermaine Garden: CSA's policies, CFA.

Chairperson: I've heard of that before but the CSA understands it. Again it's the policy of the office that they can be admitted into these reviews. Okay, anything else?

Jermaine Garden: No more procedural objectives.

Chairperson: All right, thank you so. Okay, then will move on to presentation by the administration. Mr. Chin, at this time we have the opportunity to give the reason or reasons for the rating given to Mr. Coyne for the 2015-16 school year.

Tyee Chin: So the reason why Mr. Coyne received an unsatisfactory rating for the school year was because one, we had several letters to file that showed questions in regards his proficiency in the practice. The observation also that was observed when I reviewed and I reviewed every AP observation that was entered in the advance system. There were several observations. As I kept looking at them as part of my cabinet inquiry, started noticing a pattern where every single teacher in the physio department was either effective or highly effective at 100%. So when I started to actually read the observation reports, the observation reports were not done properly.

When I spoke with Mr. Coyne about it, he indicated that he was never trained to do observation reports. Mr. Coyne was also the same person that did observation the year

*Transcribed by Transcription HUB*                                           www.TranscriptionHUB.com

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 44 of 79

prior and when I reviewed those observation reports, they were almost identical, seeming as if they were a copy-paste process. We had spent a significant number of times in cabinet inquiry discussing the ways that observations were supposed to be completed. There was no inference, evidence to support or substantiate.

Chairperson: Okay, I don't mean to interrupt, I apologize but for review of an unsatisfactory rating we can only discuss the year under review. So if you wanted comments on the observations last year --

Tyee Chin: So, thank you. The observation reports for last year, there was no evidence to substantiate, evidence to substantiate the rating that was discussed every two weeks in cabinet meeting. Mr. Coyne indicated that he did not know how to do observation as he wasn't trained to do it. So for a person to be doing the observations and having them seeming as if they were just copy and paste, because every single observation from every single teacher in the physio department seemed to be very similar. There were several goals that we had discussed that Mr. Coyne also not able to achieve during the year and that was the reason for the rating.

Chairperson: Okay, that concludes your presentation.

Tyee Chin: That concludes my presentation.

Chairperson: Thank you very much. Mr. Garden, do you have any questions?

Jermaine Garden: I certainly do.

Chairperson: Okay.

Jermaine Garden: Good morning, Principal Chin.

Tyee Chin: Good morning.

Jermaine Garden: Okay. I know what you will say but I have to say have you considered withdrawing this rating?

Tyee Chin: Have I considered it?

Jermaine Garden: Yes.

Tyee Chin: Under what circumstances?

Chairperson: Okay, no, no, no. Again, you can bring up that before the review begins, sir, but once the review begins, we're going to have to go forward with the review.

Jermaine Garden: Now, you indicated that ratings are based upon several letters to the file, because Mr. Coyne was questioning his proficiency in the practice. You indicated

4

you had a huge problem with the observations, the manner in which they were written, where they had actionable feedback, but I am perplexed. Where is a letter for the file or where is any documentation stating that Mr. Coyne was not proficient in the rating of observations?

Tyee Chin: I at the time didn't feel it was necessary to actually put an annexed letter to file on it.

Jermaine Garden: So, the question was where is it, so the answer is you never wrote a letter?

Tyee Chin: So I never wrote a letter to file. We had a discussion because my practice is to discuss first and give the AP a chance to resolve and so actively discuss it and he voice his concern. And then when I asked him why he didn't voice this concern of not having any training before we got to this level, he never answered. So what we did was we assigned the T-deck to work with Mr. Coyne to improve on the way his ratings were being done.

Jermaine Garden: Okay. There was no letter to the file for that.

Tyee Chin: Uh-hmm.

Jermaine Garden: You indicated just now that you had discussion and you had the T-deck coach work with Mr. Coyne. The question: Did Mr. Coyne's practice of rating observations more in line with the Danielson process improve?

Tyee Chin: Yes, it did improve.

Jermaine Garden: So, if it improved, why are we discussing his lack of proficiency in the practice early in the school year?

Tyee Chin: Because this didn't happen until towards the end of the school year that we are able to recognize that there was a problem. Mr. Coyne knew that this problem existed from the beginning of the school year and never made anyone aware of it until I presented the question to him towards the end of the school year. That led me to question his practice.

Jermaine Garden: I am still a little perplexed. You just stated that Mr. Coyne, you noticed that he was not rating observations according to the standard that you have established in the school?

Tyee Chin: Right.

Jermaine Garden: You spoke with him?

Tyee Chin: Uh-hmm.

5

Case 1:17-cv-08607-DLC Document 11-1 Filed 12/19/17 Page 46 of 79

Jermaine Garden:  You didn't write him any kind of letters to the file for it?

Tyee Chin:  Right.

Jermaine Garden:  He indicated that he didn't have training, is that accurate?

Tyee Chin:  Yeah.

Jermaine Garden:  He indicated he did not have proper training.  So now, you took the T-deck coach, the coach to work with him?

Tyee Chin:  Right.

Jermaine Garden:  And apparently you just stated on the record that his practice improved?

Tyee Chin:  Yes, his practice improved.

Jermaine Garden:  So the question is how can that be held against him?  There is no letter to the file addressing observations, whether they went from – initially your concern to improvement, there was no mention of that, not an immediate review at all.  There was no mention that his practice was *[indiscernible] [00:12:36]* and then the T-deck coach was working with him and then you expected to see improvement, otherwise he could face adverse ratings.  So my question is why we are talking about this if there is no letter to the file?  If it was such a concern of yours, how come those were never documented?

Tyee Chin:  So if I am hearing you correctly, the stance that CSA is taking is that I should have put a letter to the file as opposed to trying to resolve the situation, is that what your...?

Jermaine Garden:  I don't know.  You seem to be questioning in me, because I am supposed to be asking you the questions.

Tyee Chin:  No, but I --

Jermaine Garden:  I never said anything about letter to the file.

Tyee Chin:  Yes, you did.

Jermaine Garden:  I said that, I never said--

Tyee Chin:  Why was there not a letter to the file?

6

Case 1:17-cv-08607-DLC  Document 11-1  Filed 12/19/17  Page 47 of 79

Jermaine Garden: Well, I just want to know that – it needs to be on the record that Mr. Coyne was put on notice, formally put on notice. There should be improvement in the rating observations and I see nothing along those lines.

Tyee Chin: Right, same standard that you all are teacher to in terms of the expectations. So if a teacher is put on notice saying that they need to improve their practice to a level of effectiveness. If at the end of the year it improved but it wasn't at the level of effectiveness doesn't dictate the fact that all of a sudden that has to be withdrawn. He had showed improvement, was it at a level of effectiveness? No, it wasn't. But he did show improvement.

My understanding is before we start putting letters to file, we tried to correct the action. Mr. Coyne, in due diligence, tried to correct the action, so I didn't think it was warranted to put a letter to file. Was his performance up to effectiveness rating the observation? No. But did it improve? Yes.

Jermaine Garden: Okay. The bottom line, if I'm comparing you correctly, is that you did not document it with any kind of document or even along the way – initially there was no documentation that we met to approve your practice. You are stating here for the record, you'd given testimony now, correct, stating that you provide the coach to work with Mr. Coyne.

Tyee Chin: Right.

Jermaine Garden: Number two, I believe you are saving also that Mr. Coyne's practice improved.

Tyee Chin: Yes.

Jermaine Garden: But ultimately you are also saying that it improved enough.

Tyee Chin: Exactly.

Jermaine Garden: So the question is that – my question remains and it's on the record – did you or did you not ever give him any kind of documentation stating that formally his practice of writing observations is not the way it should be?

Tyee Chin: I am sorry?

Jermaine Garden: Did you ever give me a letter or any kind of document where Mr. Coyne was formally notified that his practice of writing observations using the Danielson Model is not up to standard and may result and may have an adverse effect on his rating?

Tyee Chin: I would have to check to see if I sent him anything.

Jermaine Garden: The answer is no, I think.

7

Chairperson:  Well, he can explain on *[indiscernible] [00:15:28]*.

Tyee Chin:  I would have to check in my emails to see if any formal written notice was given to Mr. Coyne about the improvement of the practice and the packet that you have, it is not in the packet.

Jermaine Garden: Then I don't think we should be discussing it if it is not in your packet. I don't think that should be considered but I'll say that *[indiscernible] [00:15:49]*. Okay, the next question I would like to ask you if we can take a look – what do you see is the role of an assistant principal?

Tyee Chin:  Okay.  So the role of assistant principal as the title suggests is to assist the principal in whatever the directives are the move the school to be effective running school.   Different assistant principals have different roles based on what their assignments are in the building.

Jermaine Garden:  When did you decide that Mr. Coyne was going to be receiving a U rating?

Tyee Chin:  Mr. Coyne's decision for the U rating was decided when I reviewed all the documents that I had at the end of the year with the final feedback session that we had.

Jermaine Garden:  And who attended the feedback session?

Tyee Chin:  Myself and Mr. Coyne.

Jermaine Garden:  Were you influenced at all by the members of the *[indiscernible] [00:17:19]* team?

Tyee Chin:  No.  The *[indiscernible] [00:17:22]* wasn't a part of that conversation.

Jermaine Garden:  All right.

Chairperson: *[Indiscernible] [00:17:43]* presentation or you finish questioning?

Jermaine Garden:  No, no, nothing *[indiscernible] [00:17:47]* but you have to go on the record to say that.  I am looking at two documents that we hadn't seen before, 3.0 and 4.0.

Chairperson:  Procedural objections *[indiscernible] [00:18:02]*.

Jermaine Garden:  Yeah, I understand that but we had not seen this before and they appear almost the same to me.

8

Chairperson: Okay, but again we are not going into that aspect of review now, let's pass procedural objections.

Jermaine Garden: And my question is why this in a packet when they are saying that there are not for the file?

Chairperson: Again that would be procedural objection.

Jermaine Garden: No, I am asking him that, I'm asking him that.

Chairperson: You can choose to respond or not respond.

Tyee Chin: I opt not to respond since we've already gone to the procedural objection.

Jermaine Garden: Okay. Let's look at – let me see. A letter dated January 4 regarding parent-teacher conferences, 6.0. Can you cite the specific CSA article that states that Mr. Coyne is contractually obligated to attend parent-teacher conferences?

Tyee Chin: No, I can't cite it because I don't memorize it.

Jermaine Garden: Okay. Mr. Coyne indicated that he will address this himself later when he does his presentation but he had family emergency at that time. When did you become aware that he was not at the parent-teacher conference?

Jermaine Garden: It's stated in the letter. Okay, next. Another January 4 letter regarding the procession.

Tyee Chin: What number?

Jermaine Garden: 5.0. You indicate that you had prior conversation with Mr. Coyne? When you talked about this, you said we discussed having the school *[indiscernible] [00:20:51]* work procession? Now, the question I have is where is that – specific directed that he has your permission first to get the dean's work procession?

Tyee Chin: Again that would have to be something I pulled from email that was directed to every single assistant principal. When I entered the building, that no procession should be approved by APs, it that must be approved by the principal. It was also sent to the teachers saying that teachers should not take approval for a procession unless it comes from the principal or the principal designate who at the time was Ms. Caporusso, the payroll chapter.

Jermaine Garden: So for purposes of this review, you do not have documentations to support that this *[indiscernible] [00:21:45]* that Mr. Coyne was specifically told that all requests for procession have to be approved by yourself or the principal?

Tyee Chin: Okay.

9

INDEX NO. 152634/2017

RECEIVED NYSCEF: 03/21/2017

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 50 of 79

Jermaine Garden:  I don't know.  Is that yes or no?

Tyee Chin:  Fine but I also have email that you tried to remove that discussed the whole fact of the procession.  I'm trying to figure what --

Jermaine Garden:  Well, the question is do you have a directive that Mr. – telling and directing Mr. Coyne that he, and not the other assistant principals or something that includes all the assistant principals but specifically that he is not to authorize procession without your approval.

Tyee Chin:  If you would like, I can send you the email.

Jermaine Garden:  No, no, I don't know.  It's not in, it's not in there.  It doesn't count.

Tyee Chin:  That's okay.

Jermaine Garden:  Okay now.  Okay *[indiscernible] [00:22:35]* seven.  Okay, I believe I finish my questioning --

Chairperson:  Okay.  Then we'll move on to presentation by advisor *[indiscernible] [00:22:57]* Mr. Garden is, if you are each going to speak can you each make your entire presentation rather than going back and forth, so whoever wants to begin that's fine but make your entire presentation.  Then again if you're both going to speak with the other the individual *[indiscernible] [00:23:12]* again with his entire presentation.

Advisor:  Okay.  So well, Mr. Coyne, go first.

Chairperson:  Okay.  Mr. Coyne.

Edward Coyne:  *[Indiscernible] [00:23:22]* good morning.

Chairperson:  Good morning.

Edward Coyne:  Just a little background.  I worked for the department of education for 25 years.  Fifteen of those last years assistant principal, administration.  I've never received anything about unsatisfactory rating in those 25 years.

Chairperson:  Okay and again, I *[indiscernible] [00:23:42]* give a little background information but remember you really have to focus on last year, because that's what review is about, last year's rating.

Edward Coyne:  Okay.  I will start with this.  The first time I met Mr. Chin was in his office.  The first thing he told me was I was told not to trust you and never told anyone, myself, who said that.  That was the beginning of the year and everything written in this document here, much of it is not true.  Will show statistics are not but they are in the

observation. I had previous experience writing letters and correspondence directed from a coach and I worked for him for a number of years.

Chairperson: Okay but again --

Edward Coyne: *[Indiscernible] [00:24:39]*. On April 11, will go back right to the date, Principal Chin stated to me a meeting that *[indiscernible] [00:24:50]* receiving – you probably be receiving a U rating, because according to him I received two letters of file in the school year. I informed Principal Chin that I agreed with such rating if that happened. Principal Chin said I would not win such grievance because he makes the determination of the grievance. He also told me at that meeting that *[indiscernible] [00:25:13]* recommend that I will be placed back in my licensed position as AP, administration/security, relieving me of my current additional title of the assistant principal supervision but held the principal education. Just for the record, I don't have a license and held the principal education. So he asked to do that position, I volunteered. In this way he also told me my budget will be cut and my AP security position will be eliminated and I will be excessed which happened *[indiscernible] [00:25:44]*. My position was cut and I was excessed. He also at that meeting named other assistant principals by name of Meyer and Morgan. For me a scrutinized determination *[indiscernible] [00:25:57]*.

Chairperson: Okay, but don't talk about third parties, really just speak about yourself.

Edward Coyne: He also told me at that meeting that AP *[indiscernible] [00:26:05]* at Flushing High School received the U rating.

Chairperson: Okay, again that's invalid point.

Edward Coyne: This is important. Okay, well, another AP – I got you. Another assistant principal received the U rating previous year for giving *[indiscernible] [00:26:19]* effective and highly effective rating. Well, essentially my reputation has been ruined by this rating. I worked 25 years with DOE, never received such a rating. I worked at a New York stock exchange before this. I was the enforcement director *[indiscernible] [00:26:47]* never received a bad rating. As I said I worked for *[indiscernible] [00:26:52]* I was a tenured track professor *[indiscernible] [00:26:55]*.

Chairperson: Okay, but let me explain to you. All of your accomplishment's quite a list here. I am sure you're 100% accurate but that doesn't mean that you couldn't have performed to an unsatisfactory level last year. So all of the good deeds and job performances that you've had previously doesn't mean that you couldn't have been unsuccessful last year. So you really should focus on last year.

Edward Coyne: As we're going to forward you can see any observations. I have observations for every teacher here. All of them are to Mr. Chin's satisfaction and the way he wanted to have them written, I want for each teacher to see it. I have more information that he says was not there but I know. I put that into evidence. You want to

see also the suspension rate which is *[indiscernible] [00:27:56]* what is going up, dramatically went down in the school from the previous year, went down 50%. In the observation report you're going to say that it went up. That's not true. We have documentation that it went down. Principal suspensions are also down above the goal of the year. In physical education and health department the credit and graduation rate, credit rate, they go up 5% from the year before. One of the problems was at the school *[indiscernible] [00:28:30]* school is students are mandated to have eight periods of classroom per day. Even if they do not need it many seniors were given extra gym glasses, physio classes who did not need the credit, especially at the end of the day and many of them cut but at the beginning of the day they did not go to class so they did not need the credit, which probably wouldn't lead to a higher rating.

Three years I was there physio and health department was up 25% and the credit *[indiscernible] [00:29:04]* went from 63% to 75%, but it went up 5% last year. To me it's a dramatic increase. The school *[indiscernible] [00:29:19]* suspensions were dramatically down every year I've been there but especially the previous year and the year I worked, is down 50% and superintendent suspensions…

Speaker: This 15-16?

Edward Coyne: Yes.

Chairperson: Okay.

Edward Coyne: It's down 50%, superintendent suspensions are down 11%, principal suspensions from the previous year.

Chairperson: If you want to submit that data, you can submit it as part of your documentation.

Jermaine Garden: Right, it's in the *[indiscernible] [00:29:45]*.

Chairperson: It's in the packet that the school sent?

Edward Coyne: No, he has it all.

Chairperson: Was that you have to get it to me?

Edward Coyne: No, I am just saying that you gave the one.

Chairperson: No, that's what I said, is it in the packet of the school

Edward Coyne: Yes sir.

Chairperson: Okay. So, you want to reference this specific data table.

Edward Coyne:  I am sorry, 881.

Jermaine Garden:  No, no, not yet *[indiscernible] [00:30:09]*.

Chairperson:  Document number 2, I think is a lot of, a good amount of data.  2.9, 2.10, is that what you're referring to?  2.7, whatever this is, several pages of document number 2, a data.

Tyee Chin:  Okay, well, we have our own packet.  I am trying not to duplicate it because everything was there pretty similar and Mr. Coyne can now – he will reference it according to the numbers that we have.

Chairperson:  Okay, you can choose whatever is easy, Mr. Coyne.  If it's easier to use, your packet is you packet.

Edward Coyne:  Okay, I am sorry.

Jermaine Garden:  That makes it easier.

Edward Coyne:  I mean, packet 881.

Tyee Chin:  I have no numbers on mine.

Chairperson:  Okay.

Tyee Chin:  He said 81

Chairperson:  This packet that he gave me had numbers.

Tyee Chin:  Right, but I don't have any numbers on mine.  So I don't know what 81 is.

Chairperson:  Okay, he --

Edward Coyne:  All right.  You start at 880.  You have it?

Jermaine Garden:  Yes, 8.0.  Well, everybody has 8.0?

Tyee Chin:  Yep, 8.0.

Chairperson:  Okay.

Edward Coyne:  That was the year 2014-15 previous year.  This original, I am going to get to that.

Jermaine Garden:  That's what comparison said.  That's the benchmark, the baseline.

13

Case 1:17-cv-08607-DLC    Document 11-1    Filed 12/19/17    Page 54 of 79

Edward Coyne: That's the benchmark.  It had 28 superintendent suspensions and only 27 principal suspensions.

Tyee Chin:  We have 28 superintendent suspensions.

Edward Coyne:  That was in 2014-15.

Tyee Chin:  But where is the 28?

Edward Coyne:  80.

Tyee Chin:  Yep, I am seeing 24.

Jermaine Garden:  Here it says 28 but doesn't have a title.  That's superintendent suspension?

Edward Coyne:  Yes, superintendent suspensions.

Tyee Chin:  In 8.0, principal, superintendent and teacher at the bottom.

Jermaine Garden:  See at the bottom.

Edward Coyne:  Yes, it says 127.

Jermaine Garden: It says 24.

Edward Coyne: 25.

Tyee Chin: It says 24 there.

Edward Coyne: 24, that's even better.

Tyee Chin:  The things at top that you have there listed for on October, November, December, January, March, April, May.  I notice that you also handwritten those DT.

Jermaine Garden:  We are going to dismiss that.

Edward Coyne:  Let's go back *[indiscernible] [00:33:01]* on the bottom is the previous year suspensions, that's 2014 and 2015.

Chairperson:  What number you want now?

Edward Coyne: 8.0.

Tyee Chin:  Right, it has the previous year superintendent suspension.  I am sorry to interrupt you, I am just trying to get--

14

Case 1:17-cv-08607-DLC Document 11-1 Filed 12/19/17 Page 55 of 79

Chairperson: Yeah, also again, I don't want to see 2014-15.

Edward Coyne: What is the reason we have this?

Jermaine Garden: This is a baseline.

Chairperson: I know but you should have written on this one.

Edward Coyne: It's my observation. Oh, I had been there also but I didn't understand it.

Chairperson: Okay, so then just talk about 8.1.

Tyee Chin: Let him explain and then I'll ask questions. That might be easier.

Edward Coyne: In 2015-16, the superintendent suspensions on 8.1 but down to 12 for the year.

Chairperson: Right, and you had down 50%. So just choose this one.

Edward Coyne: Fine, now we're down 50% and the observation which was written said superintendent suspensions dramatically increased.

Tyee Chin: Okay.

Edward Coyne: Okay, *[indiscernible] [00:33:50].* Principal suspensions also down 11% for the previous year.

Chairperson: Okay.

Edward Coyne: Those numbers are previous years as well. Every year I've been there, they decreased dramatically. The reason I bring that up is that any observation that suspensions increased dramatically, they decreased dramatically.

Chairperson: Where does it say that?

Edward Coyne: It says that in the goals.

Tyee Chin: The principal goals.

Edward Coyne: 5.1.

Jermaine Garden: 5.0, which page?

Edward Coyne: Oh, really 5.0, the goal was to reduce suspension to 10%, reduce principal suspensions to 11%.

*Transcribed by Transcription HUB*                www.TranscriptionHUB.com

Tyee Chin:  Which 5.0 we are looking at?  Your 5.0 or my 5.0?

Chairperson:  His 5.0.

Tyee Chin:  Okay.

Edward Coyne:  85.0

Tyee Chin:  In goal A, the goal that was written – among other things is reduce suspension by 10%.  That's just according to what Mr. Coyne's *[indiscernible] [00:35:14]* presentation.

Edward Coyne:  Well, according to my – okay, superintendent suspensions were down 50%, principal suspensions down 11%.  So I'll admit that point.

Chairperson:  Okay.

Tyee Chin:  In 5.0, I am still trying to --

Jermaine Garden:  Which is goal A?

Tyee Chin:  Right, in goal A --

Jermaine Garden:  Among other things, the last sentence in item number 1.

Tyee Chin:  Right, it says --

Jermaine Garden:  The last fragment of the sentences.

Tyee Chin:  So, we are talking about – my 5.0 is this one, are we all on the same one?

Edward Coyne:  I tell you what, why don't we make it same because I think you *[indiscernible] [00:35:55]*.

Chairperson:  Wait, wait.  Your 6.0?

Edward Coyne:  860.

Chairperson:  Okay.

Tyee Chin:  My 60 is a letter.

Edward Coyne:  Oh, that's right.  That's fine.  Yeah, 860.

Chairperson:  Now he's back to his.  Right, move back yours.

16

Edward Coyne: Mine?

Chairperson: When you are saying A that stands for appellant, that's your documentation. That's what I am *[indiscernible] [00:36:40]*.

Edward Coyne: Thank you, sorry.

Tyee Chin: Okay. So 860.

Edward Coyne: 860, yeah. The first goal was *[indiscernible] [00:36:49]* reduced by 10%.

Tyee Chin: Right.

Edward Coyne: We just showed that principal suspension is down 11% percent. If you turn to page 861, superintendent suspension as I stated was down 50% from the previous year. The principal states it's going to decrease the number of principal suspensions however there's been an increase in the number of superintendent suspensions.

Chairperson: Where?

Edward Coyne: 891. Motivating students.

*[Overlapping conversation] [00:37:18]*

Edward Coyne: *[Indiscernible] [00:37:24]*.

Chairperson: Okay.

Edward Coyne: Yeah, *[indiscernible] [00:37:27]*.

Chairperson: And Mr. Chin, you will have the opportunity to question Mr. Coyne or in concluding remarks just if you choose to rebut those statistics you can in your own closing remark.

Tyee Chin: Yes, that's why I figured it out. I just want to finish.

Chairperson: Okay. Yeah, don't break his train. So we're going to say make your entire presentation Mr. Coyne.

Edward Coyne: I am sorry. Also in 8.60 *[indiscernible] [00:37:55]* number 2 to create or restore objective programs by September 2016. I am not allowed to talk but I can create that by September 2016. That's number one. Number two, I had met with Principal Chin, I had met with other schools and I spoke to other schools via email *[indiscernible] [00:38:16]*, talked to people. Eddy Castro who is our outside – I don't know his exact title. He is hired by outside agency. He went to Principal Chin, myself

17

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 58 of 79

and he said he would have restorative justice program and help create. But I can't be held accountable for something. I am not at the school. This had to be done by September 2016. I am no longer working in Flushing.

Chairperson: Okay.

Edward Coyne: The increase in the participation in physio and health classes and the kids increased. One of the problems was attendance in the school, as I said with seniors being given classes that they did not need. I know you don't want to go back two years as it was a 20% increase in credit recovery. We went up, so it has to be 5%, *[indiscernible] [00:39:18]* grew up 3 to 4% in that timeframe. I mean the management procedure *[indiscernible] [00:39:25]* increase in credit. Also *[indiscernible] [00:39:38]* the management procedures said the tone in the building has improved. And that is even though I had less deans in the previous year and those deans had *[indiscernible] [00:39:52]*.

Chairperson: Okay, now you are reading --

Edward Coyne: *[Indiscernible] [00:39:54]* 6861.

Chairperson: Right.

Edward Coyne: Yeah. *[Indiscernible] [00:40:00]* management procedures like the principals. Tone in the building has improved. Thank you. However, the number of suspensions only shows a small improvement, that's not true, as we saw. That's a dramatic improvement.

Chairperson: Anything else?

Edward Coyne: Sure. So we'll see. As it says here I was successful in providing the training indicated above. I met the goal. I conducted numerous trainings *[indiscernible] [00:40:38]* et cetera. It also says here members of the deans *[indiscernible] [00:40:41]* office and school safety agents were visible but the level of effectiveness was not consistent. Soon principal suspensions were down 11%, superintendent suspensions the most serious incidents in the school, but now 50%. I have to take issue with that statement.

And the final goal E on 862 says *[indiscernible] [00:41:23]* investigation. I did the investigation. The investigation was approved by Principal Chin with the help of outside counsel of the DOE. I wrote an initial letter. I faxed that letter over to the lady who in charge. I showed it to Principal Chin but edited, wrote it again. As I stated before I'm fairly a good writer, I don't want to bring that up again *[indiscernible] [00:41:47]* correspondence like that. It was faxed over twice to the DOE. We did not hear from the lady the second time. She sent us originally a template and sample letter that was bold letters on top. I followed it the best I could this sample template. I always thought that

my letter is better than hers, but I'm not here to argue that. It was approved by the principal --

Chairperson: Otherwise she would have to be here.

Edward Coyne: Yeah, *[indiscernible] [00:42:17]*.

Chairperson: And she might disagree with it.

Edward Coyne: Yeah, no, I doubt it but that's *[indiscernible] [00:42:22]*. Yeah, Principal Chin agreed the letter. We gave it to the teacher. And like weeks later this lady said I never received the fax even though I had two fax notifications from her that she received and I talked about it on the phone.

Jermaine Garden: They went down *[indiscernible] [00:42:40]*

Edward Coyne: This was over a period of like month. It wasn't like something we did overnight. The letter was edited a couple of times. The lady was informed. She lost the last fax. They never received it. I'm not sure why she didn't receive it. We waited weeks to get the letter out. We finally get the letter out. Principal Chin agreed the letter and we gave it to the teacher. All of a sudden he said we had to pull the letter, rewrote the letter.

And finally Jermaine, physical education teacher providing evidence. I don't know what we're going to do. Principal Chen said I never went into the classes and I have the observations about teachers, I have documentations.

Tyee Chin: When did I say you never went into the classes?

Chairperson: You could bring that up.

Edward Coyne: Oh, no, you want me to confirm?

Chairperson: I don't know, we have a tape of everything that you said.

Edward Coyne: Okay.

Chairperson: One second.

Jermaine Garden: Only one second.

Edward Coyne: The observations I conducted, I went into the classrooms. I'm not saying Principal Chin sitting *[indiscernible] [00:43:57]* the classrooms. I documented evidence of what I saw. They would inform observations where I did not have to stay *[indiscernible] [00:44:06]* amount of time I stayed for the whole period. I had lesson plans previous. I had spoken to the teacher previous and after brought up the

19

Case 1:17-cv-08607-DLC    Document 11-1    Filed 12/19/17    Page 60 of 79

observation. And I have documentation for each teacher. Left after the training. My final observations.

The reason I bring that up as to the training part, I don't have a license for physio and health and basically was told that a pervious principal as he walked out the door – you're going to be in the AP in physio and health – number one. Number two, he never said anything about my observations of the previous here and Principal Chin didn't say anything until March of this year. So I'd done three out of the four observations and that's seven observations per individual and not one principal or outside *[indiscernible] [00:45:01]* anything about those observations.

Chairperson: *[Indiscernible] [00:45:09]*.

Edward Coyne: Thank you.

Chairperson: Thank you. Okay, Mr. Garden, do you want to make an opening statement?

Jermaine Garden: Well, I'd say a closing statement. I'm not going to make a closing statement. I just want to go over, you know, a packet as I speak through the rating because --

Chairperson: Okay, so this is your opening statement?

Jermaine Garden: Yes.

Chairperson: Okay.

Jermaine Garden: Okay, you know, I've done this for a few years and I'm always perplexed, not all the time, sometimes. I'm perplexed but when I met with Mr. Coyne to review everything – there was a little surprise because I don't see things that I almost thought I would see. Goals and objectives I see is dated December 1. Yeah, I'm not sure of the date that Mr. Principal and Mr. Coyne met to go over goals and objectives. I thought I saw in the – it says November 5 in the closing one. I'm looking at my packet now, it's easier.

6.0 indicates that Mr. Chin and Mr. Coyne met on November 5 to discuss the goals and objectives. I was a little perplexed that it took almost two months for that to happen as 20% of the school year had passed before the Assistant Principal Coyne honestly knew what the goals and objectives were as established by the principal for the '15-16 school year. And this is a school that's in --

Chairperson: Okay, that's – it doesn't matter what the school is in.

Jermaine Garden: No, no, I was just going to say it's a school that the principals had frequently almost every year, so it's hard to say what the goals and objectives are. That's

all I was going to say. So it took almost two months for Mr. Chin to meet with Mr. Coyne to go over the goals and objectives that he expected of him for the year and then took another few weeks for him and Mr. Coyne to receive this in writing. So for all practical purposes Mr. Coyne and Mr. Chin were on the same page as of December 1 when this letter – I don't know why Mr. Coyne got it but the date was December 1 – of what the goals and objectives were as Mr. Coyne indicate --

Chairperson: I'm trying to find which letter you --

Jermaine Garden: 5.0.

Chairperson: 5.0. Okay.

Jermaine Garden: And then – originally I said 6.0 because that indicates the date that you met?

Tyee Chin: Okay. So you're looking at 5.0?

Jermaine Garden: We're now going to 5.0.

Tyee Chin: Okay. So where in 5.0 does it show the date that --

Jermaine Garden: No, no, 6.00 was the date. It says November 5, we met to discuss the goals and objectives.

Tyee Chin: Mm-hmm.

Jermaine Garden: Seeing this specific assignment is okay. Originally I had said Mr. Chin that 5.0 doesn't indicate the date but it is indicated in 6.0. So I was just unsure. So goals were finalized, reduced the writing on December 1. As Mr. Coyne indicated he spoke about the attendance – not attendance. He spoke about reducing suspensions and he reviewed the data that shows suspensions actually decrease. And restorative justice program for Flushing High School by September 2016, that cannot be held against him, would not have that in place because he was not there in 2016. He was only there from June 2016. And to increase student participation in physio and health classes by 10% as Mr. Chin indicated in his summary that goal that goal was met.

Now we can look at goal two or goal B in 6.0. Mr. Chin wanted the *[indiscernible] [00:49:18]* the scholarship reports and so forth, chief effectiveness and administration. Mr. Chin acknowledges that the scholarship *[indiscernible] [00:49:29]* increasing credits. It was less than – he's indicating it was less than a 5% increase but nonetheless it was increased. It said that Mr. Chin worked actively with the small running community, tone in the building has improved, number of suspension only shows a small improvement. He doesn't indicate whether Mr. Chin has met that goal – Mr. Coyne, I'm sorry. He *[indiscernible] [00:50:05]*.

Chairperson:  Well, Caldone wouldn't have either.

Jermaine Garden:  Oh, that's true too.  That's true too.  I'm sorry.  It doesn't really indicate whatever Mr. Chin feels that Mr. Coyne, you know, met that particular goal for receiving – we say somebody met a goal, he didn't meet.  What's his feelings on that goal?  Then you go to goal C.  It says he was successful in providing the training indicated above.  The members of dean's office as I said were visible but the level of effectiveness was not consistent.

Once again there was no evidence that we saw presented there in Principal Chin's presentation.  When looking at the packet it says that this was every area of concern that he wanted to see effectiveness was more consistent.  There was never a document submitted nor was there that any mention that Principal Chin was concerned about – if you're going to goal B that the number of credits was – although it was increasing it was lower than 5%.  I don't see any evidence other than 6.0.  It says that on March 18 they did a mid-year assessment of the goals but there's no document right above the mid-year assessment.  And I say that because – and then obviously in goal D, he said Mr. Coyne was successful in achieving this goal.

And the reason I'm bringing that up is because when we sat down he set down the goals and objectives November, he finally gets it December.  They have a mid-year a little later than, you know, middle of March but because the goals were not established until December, it's not a bad mid-way point to sit down and discuss it but there was no write-up of where Mr. Coyne was in terms of meeting the goals.  So, he would have an idea.  We can't go back on past practice.  We can't go what happened in '14-15 for many reasons.  Number one, we're not talking about '14-15 and number two Mr. Chin was new to the school in '15- 16.  So there was no putting Mr. Coyne on notice to let him know where was he in terms of meeting his goals and objectives.

Okay, I have pretty much – Mr. Coyne did most of – he worked through the goals.  We're basing on the goals, we already about talked about the letters and the data.  So now this concludes my presentation.

Chairperson:  Okay.  So Mr. Chin you can either question Mr. Coyne or you can just refer to his presentation with anything you want to say about it and your concluding remarks.  So you want to go to questions?

Tyee Chin:  Yeah, I'll ask a few questions.

Chairperson:  Okay.

Tyee Chin:  Mr. Coyne, when was it that you were required to submit your written goals and objective?  Just answer the question.

Edward Coyne:  I understand.  I don't recall.

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 63 of 79

Tyee Chin:  In September, October, November?

Edward Coyne:  I don't recall.  It definitely was in September.  I mean, if we met in November obviously it would just be --

Tyee Chin:  Wasn't it a fact that all APs had to submit their goals, their written goals in October and that we would then schedule a meeting to discuss the written goals and it's alignment which is why you had the meeting in November?

Edward Coyne:  That's fine.  [Indiscernible] [00:54:00].

Tyee Chin:  Yeah.  [Indiscernible] [00:54:01].

Chairperson:  Well, do you recall, you don't recall?

Edward Coyne:  I don't recall.

Chairperson:  Okay.

Edward Coyne:  But I did remember giving him goals and objectives which are reflected in the observation.

Tyee Chin:  Wasn't it a fact that when I requested for you to submit your goals and I gave you the template, you submitted to me your duties and I had to resend it back to you to ask you what your goals and not your duties as an AP?

Edward Coyne:  I don't recall such a thing.  My goals and objectives were given to you as every other principal I have never worked with.

Tyee Chin:  After I had sent back your duties because I'd sent you a template of what I would like you to have your goals written in but you sent me the list of things that you were doing as an AP and I said that, no that's not what I asked you for.

Edward Coyne:  You have that in writing, I like to see.

Tyee Chin:  I could show you but that wasn't requested to be brought here, so that wasn't brought here but I can always provide it.  You spoke in your presentation about your previous experience, that you had 15 years working as an admin and that you have extensive experience in writing letters, right?  Isn't it true that when you submitted – when you were supposed to do the investigation, you submitted to me that you have never written a letter to file before?

Edward Coyne:  I'd never written.  Yes.

Tyee Chin:  Yes.

23

Edward Coyne:  Letter to file.

Tyee Chin:  You'd never written investigation letter to file?

Edward Coyne:  No.  And I guess I stated I used the template sample.

Tyee Chin:  Before we get to the template sample, you stated that you have never written letter to file?

Edward Coyne:  Yes.

Tyee Chin:  You've been an AP admin, AP security for 15 years?

Edward Coyne:  Yes.

Tyee Chin:  And in a building like Flushing High School [*indiscernible*] [*00:55:48*] with all of these investigations, you'd never had to write a letter to file?

Edward Coyne:  No, because one principal I ever work with would allow us to write the letters.  The principal wrote the letters.

Tyee Chin:  The principal wrote the letters, okay.  Let's go on the fact of the same letters that we're talking about.  The directives that was given to you from legal – and I will tell you that I did agree with the letter when it was written, but again I am not the office of legal services.  The directives – wasn't the directive given to you to write the letter and send it to legal first before --?

Edward Coyne:  First the letter was written, yes – both the letters were written, edited by yourself, myself and sent to legal.

Tyee Chin:  Right.  But --

Edward Coyne:  And she came back the first time and said that was fine.

Tyee Chin:  But – no, no.

Edward Coyne:  She never came back ever since.

Tyee Chin:  The letter was – isn't it true that letter was given to the staff to be signed before submitting it to legal which is where the problem came?

Edward Coyne:  No, first letter was submitted.  The second letter she came back weeks later and said she wanted the letter checked.  She finally got a chance – she said the first letter was sent to her and that we had faxed though.

Tyee Chin:  So since you presented that as part of --

24

Edward Coyne:  And then the letter was faxed though.

Tyee Chin:  Right.  Since you presented it as part of your argument, do you have the evidence because she typically interacted with us by email, the evidence by email to substantiate where she --

Edward Coyne:  Actually you should have it.  I gave you all the information that --

Tyee Chin:  But you're the one that presented that part as your argument, not me.

Edward Coyne:  Fine.  No.  You have it.

Tyee Chin:  So there is no evidence to substantiate this argument that you brought forward with the claim that you faxed it and she lost it and this back and forth?

Edward Coyne:  No, the only argument I have is you approved the letter and you [indiscernible] [00:57:39].

Tyee Chin:  Yes.  But my understanding, based on the email back and forth, was that the directives – and this has always been the directive of the DOE – is that you don't give a letter to file until legal approves it.  The letter was given to the staff member before legal approved it, which was why we had to pull the letter and then sent it back to legal to approve it and then we were able to then resubmit the letter to file the second time.  So 15-year career in security and administration, I thought you would have been aware of that practice.

Edward Coyne:  The letters were faxed out.  And once again you approved the letter.

Jermaine Garden:  I think Mr. Coyne already stated that principal said the letters are part of his --

Chairperson:  Okay, okay.  Well, then Mr. Coyne [indiscernible] [00:58:38] was accepted.

Jermaine Garden:  No, but I don't want – I don't want to feel like he's been badgered at. He already said he never wrote the letter to the file.

Chairperson:  I don't think you're being badgered.  If you feel that way you can speak up, Mr. Coyne.

Edward Coyne:  No.

Chairperson:  Thank you.

Transcribed by Transcription HUB

www.TranscriptionHUB.com

Tyee Chin:  So to go back to the evidence of the investigation, is it the policy in the past --

Chairperson:  We'll just stick to last year.

Tyee Chin:  Last year because the policy is – since we're looking at last year, right?

Chairperson:  Well, this is the question…

Tyee Chin:  Correct.  This is last year.

Chairperson:  Or again you can make that a statement in concluding remarks.

Tyee Chin:  So all investigations are done by AP security unless I personally give the directive that I will do the investigation.

Edward Coyne:  If the principal states such --

Tyee Chin:  Right.  And so I have stated in the building all investigations are done by AP security.  This is part of your job duties unless I state otherwise that I would do them.  Isn't it true that you did an investigation on Mr. [*indiscernible*] [00:59:39] Mr. Barrow and Ms. Levi?

Chairperson:  Okay, you can't use last names but if it's not necessary --

Tyee Chin:  Right.  So you did investigations on three staff members last year for inappropriate behavior in classrooms?

Edward Coyne:  Yes.

Tyee Chin:  All right.  Is there a reason why if all the letters are supposed to be done as my directive…

Interviewer: It's done by AP Security, is the reason why one particular staff member did not have any letter submitted to legal to substantiate the evidence that she, her actions was inappropriate.

Edward Coyne: Which letter?

Man 2: Say yes or no.

Edward Coyne: He just mentioned three letters.

Woman: Okay if you want to use *[overlapping conversation] [00:00:25]*

Man 2: Mr. Mitch accomplished two investigations run in, one that she told a child to shut up.

Woman: Okay.

Interviewer: She had two investigations and we have no letters.

Edward Coyne: Her letter, yes for her letter was never found - the letter. I had left the school by then.

Interviewer: No, the investigation was in June.

Edward Coyne: The investigation was handed to you all…

Interviewer: Was completed by June.

Edward Coyne: Yes it was. All of the witness statements were handed to you and you did not make determination of guilt or not.

Interviewer: Yes we did. You were supposed to write a letter.

Edward Coyne: I understand that.

Interviewer: A determination was made by June 6.

Edward Coyne: No one had directed me to take the letter.

Interviewer: Yes we did.

Edward Coyne: As a matter of fact you went back and told me to get more information. We didn't have enough on the teacher. And you actually told one of the *[indiscernible] [00:01:15]* to go back and find more information because I didn't have enough information.

1

Interviewer:  The investigation was…

Man 2:  Okay no but we're going to go no place because you have one opinion on the incident and another opinion on…

Interviewer:  The questions anyway.

Man 2:  So we're going yeah.

Interviewer:  The point is this Mr. Coyne aren't you aware that investigations have to be done within 10 days?

Edward Coyne:  Yes

Interviewer:  Okay.  So if this investigation was submitted to you by June 6 you were still in the building 10 days later.  Everything was substantiated.  Why was there not a letter to file?

Edward Coyne:  Because I'm not the principal and I was not directed to write it.

Interviewer:  I've already stated from the beginning that the principal…

Edward Coyne:  My investigation and findings were handed to you.

Interviewer:  …will tell specifically when you will write the letter to file.  As part of your job description you were responsible for writing a letter to file.

Edward Coyne:  That was not my job description.

Interviewer:  Okay.  Um…

Edward Coyne:  And is that my goals and objective?

Interviewer:  Your goals and objective isn't the only thing that you have to do in the building.  You started talking about the data set with the 50% decrease in suspension and a 15% decrease in suspension for the principal.

Edward Coyne:  Mm-hmm.

Interviewer:  Yes, we do admit that there was and it's in writing that there was a decrease in some areas.  However, the document that you submitted only showed up until January.

Edward Coyne:  Actually it doesn't.  I mean I had to read *[indiscernible] [00:02:37]*

Interviewer:  So, in 8.1 and in…

2

*Transcribed by Transcription HUB*                                    www.TranscriptionHUB.com

Edward Coyne: That is yours or mine?

Interviewer: Yours. In 8.1 and in eight the document that you submitted previous year suspension for Superintendent 2014/15 of course that's hand written so I don't know which year that is.

Edward Coyne: All right, first of all 8.1 what's for 8.1?

Interviewer: No, let's go. Let's start up at 8.0. In 8.0 you have hand written 2014/15 so I don't know exactly if that's actually 2014/15 I don't know what you're using to substantiate that data that's the first question.

Edward Coyne: Part of the page was cut off. And if you want to go to 8.1 *[overlapping conversation] [00:03:19]*

Interviewer: No, but you that's something that you wrote at the top of previous year suspension. You wrote it in pen. Right?

Edward Coyne: Mm-hmm wrote in 8.1 the previous three years.

Interviewer: Right. And you did the same thing also in 8.1 and I'm trying to figure out how can I substantiate that these are actually those years if they're written in pen?

Edward Coyne: No, because the previous the bottom of the page is cut off. But on top on 8.1. If you want to go to 8.1…

Interviewer: Is there anything in the page that shows from the report that that is actually the date without you writing it in? A timestamp something that dated it?

Edward Coyne: That's how it comes out of course.

Interviewer: Okay. So, then how can you substantiate that this is that year?

Edward Coyne: But back in there was at this moment I can show you.

Interviewer: Okay. Also if we go back to 8.1 you have the date for the ORs report for - rom September to June but the Superintendent goes only to January.

Edward Coyne: Yeah, that's a simple explanation. If you look at the top of the page the OR is of the entire year. Superintendent suspensions are October, November, December and January for the reason being there were no Superintendent suspensions after January. If you look in the bottom of the page principal suspensions are for the entire year as well.

Interviewer: Yes. So…

3

Edward Coyne:  Any time a suspension is generated within two months there were no Superintendent suspensions from January.

Interviewer:  So you're telling me that there was absolutely 0% superintend suspensions from January all the way to…

Edward Coyne:  Yes sir.

Interviewer:  So how is it that in January it's up 12 and then you said that it was at 24?

Edward Coyne:  The previous year it was 24.

Interviewer:  Previous year.  So, now my question is this wouldn't then be giving you zeroes for no Sup -- just like in May and June and all those others?

Edward Coyne:  Any ORs that's how it comes out.  It shows you only when you have a suspension.  If there are no suspensions in those months there are no pages for those months.

Interviewer:  Okay.

Edward Coyne:  As you can see the principal there's no jump.

Interviewer:  Sir.

Edward Coyne:  All the others do know that.

Interviewer:  You also stated that I had a meeting with you.  I'm trying to remember when.

*[Background conversation] [00:05:46]*

Interviewer:  You stated that I met with you and discussed your rating that you're going to get in your rating in April.

Edward Coyne:  Mm-hmm.

Interviewer:  Where is evidence of this discussion that happened?

Edward Coyne:   The only evidence I have ever that letter to CSA immediately after the meeting.

Interviewer:  Where is that evidence?  Did you submit it?

Edward Coyne:  To the CSA yes.

4

Interviewer:  Did you submit it into the case here, because you're the one that presented this?

Edward Coyne:  For A4.0.

Interviewer:  So let's go to A4.0.  I don't have 8.00.

Man 2:  A4.0.

Man 3:  Again what?

Man 2:  A, apple, 4.0.

Interviewer:  A.

Man 2:  A4.0.

Interviewer:  Okay I heard eight.  So this is, is this supposed to be an email or is this supposed to be a letter?  Is there a timestamp with this?

Edward Coyne:  I don't have a timestamp in my office.

Interviewer:  Right.  So, that this was sent as a letter?

Edward Coyne:  It was an email to the CSA.

Interviewer:  Right.  So, if this was an e-mail to CSA where is the e-mail part of it to show the timestamp?  Because this just looks like something typed up.  This could have been typed up after the fact.

Edward Coyne:  As you stated I could always go to my computer.

Interviewer:  Right, but the answer is no you don't have a timestamp to show that this was submitted right after we had that meeting.

Edward Coyne:  No.

Interviewer:  Okay.  I don't recall having that meeting with you.  You also stated that your position was cut because that you were going to get a U rating.  Isn't the fact that your position was cut because you retired?

Edward Coyne:  No, and you terminated my position.  The reason I retired and I would never have retired is that you stated the budget was cut and you…

Interviewer:  The budget was not cut.

5

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 72 of 79

Man 2:  Okay.  But again now we're just going on hearsay.  I mean we have no documentation of conversation.

Interviewer: There's no documentation of the conversations.  There's no documentation to show that there was a cut in the budget.  The fact that matter was Mr. Coyne's position was removed when Mr. Coyne put in his retirement.

Edward Coyne:  Nobody never told.  I would have never retired.

Interviewer:  But you have no evidence to substantiate that claim.

Edward Coyne:  Neither you.

Interviewer:  You're the one that made the claim.

Man 2:  Yeah, yeah, yeah but this is just going now back and forth.  Come on let's just you know.

Interviewer:  Right.  Um, so you also made reference to the evidence of the restorative justice practice that in your goal it was that you would have this thing already set up and ready by September 2016.

Edward Coyne:  Mm-hmm.  And if I was at school would have…

Interviewer:  So, that means that the intention at that point and I'm going to go to the question.  The intention at that point was that you would be in the school in September '16.  Yes?

Edward Coyne:  Yeah.

Interviewer:  So then my question to you is the first one why would I be cutting your line if the intention was that you be in the building 2016?

Man 2:  He has no way of knowing that.

Interviewer:  But...

*[Overlapping conversations] [00:09:26]*

Interviewer:  Why would I be cutting your line if you were expected to be there in 2016?

Edward Coyne:  I just came here in May.  I would have never retired if you didn't tell me my line was cut and I had no choice.

Interviewer:  You have no evidence to substantiate where I told you that your line was cut.  The other question is the restorative justice you claim in your statement that Mr.

6

Castro was going to be the one to create this restorative justice. Where is the evidence to substantiate that one?

Edward Coyne: We have to call Mr. Castro.

Interviewer: But you are the one that presented this as evidence.

Edward Coyne: So, as no relevance I am not there.

Interviewer: You are the one that brought it on.

Edward Coyne: I understand that, but I am not there in September 16th so I can't be held accountable.

Interviewer: But this conversation, happened while you were there, because you were in the building.

Edward Coyne: I understand that. And you were there also.

Interviewer: Yes and I am asking you where is the evidence to substantiate this?

Edward Coyne: We have to call Mr. Castro. *[Overlapping conversation]*

Interviewer: You also made the statement and I am trying to get clarity on it, you said that there was a cut in the dean's position. Which is 100% accurate, and that because of it, you weren't able to make the gains that you were expected to make, am I clear, on this part I need clarity on?

Edward Coyne: I never said that.

Interviewer: That is why I need clarity. Are you saying that the dean's position because of the cut in the deans' position, you weren't able to make the reductions in…

Edward Coyne: In the opposite, the opposite was. Even though we were severely cutting the dean's position.

Interviewer: Right.

Edward Coyne: We dramatically reduced the *[indiscernible] [00:11:09]*

Interviewer: Good, so my question is why didn't you bring up the fact that the dean's position being cut.

Edward Coyne: This year you reinstated every one of them.

Interviewer: No I didn't reinstate any dean's position. And this is not about this right.

7

Case 1:17-cv-08607-DLC   Document 11-1   Filed 12/19/17   Page 74 of 79

Woman:  Getting you know Mr. Chin, sometimes it is better off just to make it as a statement in your concluding remarks, I don't think that the two of you are going to agree on much at this point.

Interviewer:  And I agree.  Okay, *[indiscernible] [00:11:35]* so did we not meet yes or no, at the end of the year to discuss your final rating?

Edward Coyne:  No.

Interviewer:  We didn't meet.

Edward Coyne:  No.

Interviewer:  So I met with every single AP and I didn't meet with you?

Edward Coyne:  You have no way of knowing that.

Woman:  Okay, again.

Man 2:  I know from the saying he has no way of knowing whether Mr. Chin met with all the other AP's.  He just said that Mr. Chin didn't meet with him.

Interviewer:  So, did we meet as I stated midyear to discuss your goals.

Edward Coyne:  Midyear, you have.

Interviewer:  Yes, and so when I was discussing your goals with you and we talked about the suspensions and the rating that is going on, is there a reason why you didn't request documentation to substantiate the evidence of this meeting?

Edward Coyne:  His roles are good.

Interviewer:  But you are the one who are bringing it up, that there is a role,

Woman:  Okay so, I don't think that is going to affect this entire review.

Interviewer:  At this point I am finished asking Mr. Coyne questions?

Woman:  Okay fine, would you like to make a concluding statement.

Interviewer:  Yes.

Woman:  Okay, go ahead.

Interviewer:  So my concluding statement is that I will stand on the record at this point in time, that there was not enough evidence to substantiate effective or a satisfactory rating

8

Case 1:17-cv-08607-DLC Document 11-1 Filed 12/19/17 Page 75 of 79

at the end of the school year, Mr. Coyne did and make progress, that is a fact. There was improvement in the building that is a fact. The fact is that there were set benchmarks that Mr. Coyne agreed to when we met to discuss his goals, and he was not able to reach all of the bench marks. He met some, but not all of them. And because of the issues in terms of the letter to file with a certain inappropriate practices I did not feel the need to substantiate the satisfactory rating.

Woman: Okay thank you very much. Concluding remarks, same thing one at a time, or just an entire closing statement?

Edward Coyne: I am just going to reiterate, I worked many years in the system and I have never been treated like this, in 25 years. I think I proved my case, statistics proved that there was no evidence other than what is there. Everything that is, some of the things that are there are either irrelevant or erroneous and this hurt my reputation, 20 years of working never received anything – an unsatisfactory rating? You know and my principals *[indiscernible] [00:14:15]* I would love to have that. The only reason I retired I did not want to retire, because he told me point blank, that I was going back as AP Security, my budget line was going to be cut, and didn't not have a job *[indiscernible] [00:14:27]* I would have never retired, I would be back at Flushing High School, because I love the kids there.

Man 2: Okay thank you, okay Mr. Gardner, any closing remarks?

Man 3: Yes sir. Okay as I sat here and I went over the paperwork we spoke with, I spoke with Mr. Coyne at length when this was first assigned to me, I got a chance to meet Mr. Chin today for him to do a presentation and I am totally perplexed, I am totally perplexed as to why Mr. Chin gave Mr. Coyne an unsatisfactory rating? Mr. Chin stated during his cross examination or questioning that there was no documentation that Mr. Coyne didn't have documentation, well Mr. Chin didn't have documentation for many things during this review, as it came out. And if it wasn't present in the office today, where we are, you didn't have it, it shouldn't be considered. Mr. Coyne has no way of knowing why his line was cut. He has no way of knowing it. He can only go on based on what is told by Mr. Chin.

Mr. Coyne should not have to request documentation for any meeting he has with the principal. Mr. Chin is not a new principal, he has been a principal before and I am surprised, that anybody request documentation for a meeting, that's the principals responsibility when you meet with an assistant principal if you want to provide written documentation to memorialize the conference you do it. Same thing you do with AP's will do it with teachers, and so forth. This was a - Mr. Chin never really put Mr. Coyne on notice, that a U rating was possible, by his own testimony. There was mid-year review, never came up. Never came in fact, the letter that Mr. Coyne wrote to CSA dated April 11th Mr. Chin basically said he does not recall having that conversation. So his own words in "I was on my *[indiscernible] [00:16:29]* tape shows that that Mr. Coyne was never put on notice as we say, the U rating was possible if your performance did not improve. He received 2 letters for the file. One dealt with procession for the Dean, for an

hour, which was really just to whether it was a policy thing, and the other one dealt with Mr. Coyne had a family emergency and he hadn't notified Mr. Chin that he couldn't stay for parent teacher conferences. Parent teacher conferences are not contractually, as CSA members, they are contractually mandated to attend those conferences.

Past practice we have always attended because it only makes sense and there is a clause in the contract that sort of that falls into. But specifically CSA members are not obligated to attend PTC's, UFT members are, as by contract. Both *[indiscernible] [00:17:22]* on the file that he gave him, for not attending the parent teacher conference, the question about hiring a dean for procession, none of them have anything to do with Mr. Coyne's day to day responsibilities and making Flushing High School like safer, better place to learn as AP in charge of security. Neither one of those.

Mr. Chin spoke of the observations, well; you know the observations were not well written they were not, they were a carbon copy from previous years, and so forth, but once again none of that was documented none of that submitted into evidence. He did state that he had a coach work with him, but he's made progress but none of it, was documented and it was not part of the packet, should not even be considered. He received 2 and then these 2 memos 3.0, 4.0 for example are given they almost are the same thing to me, but at the bottom it says, I have received a copy of this memo. These were not going to the file, these are just memos. The he gave you about what to do with these lone eye incidents and so forth; they should not even be considered.

Because they have not, Mr. Chin gave it to Mr. Coyne and Mr. Coyne signed to acknowledge receipt, but not to the point that it was going to be used for disciplinary action. *[Indiscernible] [00:18:39]* necessary for the efficiency and effectiveness of our school, community. The prior sentence says, please just note that all incidents reported to OR as required. No way that is to say that that is going to have effect on his rating and so forth. There was no documents or evidence of a midyear review, and we have no idea sitting here, Mr. Kal Donavan the only person's name that doesn't begin with a C we have no evidence of what took place during the mid-year. We have no evidence of us sitting here however Mr. Chin thought Mr. Coyne was on track to meeting his goals or not. None.

Once again it as not documented. No mention of the observations or anywhere in the packet as I indicated before well. There was no fitting -- no evidence that Mr. That AP Coyne submitted responsibilities and not goals and objectives, Mr. Chin stated that when he originally asked for goals and objectives that AP Coyne submitted responsibilities or you know and so forth and they have to go back and forth a little bit before he finally got the goals and objectives. But there was no evidence, I don't see, I don't agree with e-mails being submitted but I don't see any e-mails, I don't see any letters, I don't see if they filed or on file that you didn't submit your goals and objectives to me in a timely fashion, none of that.

Mr. Coyne stated he never wrote a letter to the file. He indicated that there was always done it all his almost 15 years at the school principals wrote letters to the file. Principals

dealt with OSI illegal issues. Once again there is no letter to the file or no letter non filed letter or otherwise no documentation to any shape form or fashion that Mr. Chin had an issue with what happened with this OSI case legal with the letter being given back and forth. None of that it shows up on the reading but there was no mention of that in individual documents.

If Mr. Coyne didn't submit a letter, didn't submit a letter in the proper fashion as his supervisor Mr. Chin had a responsibility to intervene. He said this happened on June 6 if it wasn't submitted within a 10 day period I know OSI. They will call, they will email the principal. Mr. Chin was Mr. Coyne's supervisor and as his supervisor he is supposed to make sure that Mr. Coyne is doing his job to the best of his ability. Mr. Chin did not exercise that process in this case. I believe for all the reasons I stated before and was stated during this hearing that this rating is unfair, unwarranted, it's arbitrary and capricious, and it was given for reasons other than performance. And we are asking that the rating be reversed.

Man 2: Okay I would like to thank you all for your participation and cooperation. I'm charged with the responsibility of preparing the report of these proceedings that will be relayed to the chancellor who will in turn report the decision to all participants. It's now 10:39 AM and I'm concluding this review.

11

# EXHIBIT H

**NYC Department of Education**
Carmen Fariña, Chancellor

November 21, 2016

Date of Review: October 14, 2016

Mr. Edward J. Coyne Jr.          File #
28 E. Grove Street
Massapequa, N.Y. 11758

Dear Mr. Coyne,

Please be advised that the appeal of your rating of "Unsatisfactory" for the period ending June 30, 2016, has been denied and the said rating is sustained as a consequence of failure to discharge your professional responsibilities as well as a failure to follow school policy and procedure.

Sincerely,

Philip Weinberg
Deputy Chancellor for Teaching and Learning
(Designee for Carmen Fariña, Chancellor)

PW: J.C.

C:    Office of Field Services
      Office of Pedagogic Compensation
      Office of Teacher Records
      Michael Alcoff, Queens H.S. Superintendent
      Tyee Chin, Principal, Q460
      CSA Headquarters